Argued May 2, affirmed October 18, 1961

# CALDWELL ET UX v. WELLS
## 365 P. 2d 505

*Joe French,* Pendleton, argued the cause for appellant. On the brief were Currin and French, Pendleton.

*Harold A. Fabre,* Pendleton, argued the cause for respondents. On the brief were Fabre, Collins & Kottkamp, Pendleton.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

O'CONNELL, J.

This is an action in which plaintiffs seek damages for an alleged breach of contract. On March 20, 1959, plaintiffs entered into a contract with defendant to purchase a house and lot. The contract was memorialized in a Steven-Ness "Earnest Money Receipt" form consisting of one page. Pursuant to this contract defendant and his wife executed a warranty deed to

plaintiffs on April 8, 1959. The complaint alleges that, as a part of the transaction, "defendant agreed to drill a well on said property so as to furnish plaintiffs with a satisfactory supply of water for domestic use" and that defendant breached this contract. The alleged agreement was not made a part of the contract or deed.

The trial court entered findings of fact consistent with the allegations in plaintiffs' complaint. The trial court concluded that defendant breached the contract in that the water from the well was muddy; that the well did not furnish a satisfactory supply of water for domestic purposes; and that the well caved in because it was not properly cased. The trial court entered judgment for plaintiffs in the amount of $1,443.37. Defendant appeals. The issue on appeal is whether there is any evidence to support the findings of fact.

Plaintiff Charles Caldwell was the sole witness in the case. He testified that prior to the execution of the contract he went upon the land with defendant, at which time he inquired about the well and the supply of water. Defendant stated that it was a "good well." Caldwell testified that he asked defendant whether the well "would supply sufficient water for the property or not" and the defendant "said it would produce twelve to fourteen gallons per minute, and that was sufficient enough to supply what water we needed for household use plus irrigating the lawn." Caldwell further testified as follows:

"Q Who agreed to—what was the agreement so far as equipping the well with a pump?

"A Mr. Wells said that he would have the pump installed and it would be all hooked up ready for use.

"Q  By hooking it up, what had to be done in order to hook it up?

"A  The well-house had to be dug, foundation built, the pump had to be installed and the line laid from the pump to the house to connect into the plumbing in the house.

"Q  Mr. Wells agreed to do all that?

"A  Yes sir."

Defendant built the well house and installed the pump but the well did not produce water suitable for domestic use. When plaintiffs took possession of the property the water from the well contained sediment rendering it cloudy and murky. Eventually the pump failed to raise any water from the well, whereupon plaintiffs had the well repaired. From the time when plaintiffs took possession until the well was repaired it did not supply water suitable for household use.

Defendant contends (1) plaintiffs must rest their case on an implied warranty of quality and that such a warranty is not recognized in the sale of real property; (2) that the oral agreement relied upon by plaintiffs is unenforceable because it is within the Statute of Frauds; (3) that the evidence of the oral agreement is inadmissible under the parol evidence rule; (4) that the deed merged the previous agreement, and (5) that a warranty is not enforceable if it does not appear in the deed. The last point will be treated first.

■■ Defendant relies upon *Steiber v. Palumbo et al,* 219 Or 479, 347 P2d 978 (1959), which holds that the law will not imply a warranty of quality in the sale of real property. In that case the purchaser sought to recover on the theory that in the sale of a house and lot the seller impliedly warrants that the house, including the foundation, is of substantial and sturdy

construction. There was no express promise with respect to the quality of the structure and the law is clear that a warranty of quality will not be implied in the sale of real property. But the rule rejecting implied warranties in the sale of real property is not applicable to the case at bar. The promise which plaintiffs seek to enforce in this action was defendant's promise to install a well for plaintiffs' domestic use. Admittedly, the defendant's promise to furnish a usable well was a part of the transaction which culminated in the transfer of the title to real property and it is reasonable to assume that without that promise the plaintiffs would not have purchased the property. But the concession that the defendant's promise was a part of the bargain for the transfer of title does not establish the proposition that his obligation rests upon an implied warranty of quality. The asserted obligation can be found in defendant's promise rather than in an implied warranty created by law. The evidence is sufficient to establish that the defendant's promise was not simply a promise to furnish a well, but that it was broad enough to include the obligation to furnish a well which would produce water adequate for plaintiffs' domestic use. The defendant's promise to furnish a well, taken alone, would not, of course, create a promissory obligation to put into operation a well which would furnish water suitable for plaintiffs' use. But the promise to put in the well-house and pump cannot be isolated from the negotiations which led up to the final execution of the contract for the purchase of the property. Those negotiations reveal that plaintiffs were bargaining not only for a house and a parcel of land—they wanted a supply of water adequate for their needs. The statement made by defendant prior to the execution of the

contract to the effect that the well was a "good well" and that it was sufficient to supply plaintiffs' domestic needs, gives color to defendant's later promise to install the well equipment.. We regard this later promise as a promise to supply well water suitable for plaintiffs' domestic use. Whether we describe the promise as express or implied in fact is immaterial; under either construction the liability arises out of a promise and not out of a law-created implied warranty of quality.

The express or implied in fact promise created a contract separate from, although collateral to, the contract for the sale of the land. Cases involving construction contracts accompanying the sale of land are in point. See *Becker v. Lagerquist Brothers, Inc.,* 55 Wash2d 425, 348 P2d 423 (1960).[1] See also, footnote 2 in the margin.

It follows that the rule precluding the implication of warranties of quality in sales of real property is not applicable to the present case. Therefore, *Steiber v. Palumbo, supra,* relied upon by defendant is not in point.

■■ It is next asserted by defendant that the parol evidence rule is applicable to exclude the evidence of

---

[1] Some of the cases involving building contracts are decided upon the theory of an implied warranty that the contractor will build the structure without material defects and that it will be suitable for the purpose for which it was constructed. Hoye v. Century Builders, 52 Wash2d 830, 329 P2d 474 (1958); Miller v. Cannon Hill Estates, Ltd. [1931] 2 K B 113; Bearman, Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule, 14 Vand L Rev 541 (1961); Dunham, Vendor's Obligation as to Fitness of Land for a Particular Purpose, 37 Minn L Rev 108 (1953); Comment, 5 DePaul L Rev 263 (1956); Note, 18 Md L Rev 332 (1958); Note, 34 Wash L Rev 171 (1959). The analogy to the implied warranty of quality in the sale of goods is suggested. Farnsworth, Implied Warranties of Quality in Non-sales Cases, 57 Columbia L Rev 653, 660 (1957); Prosser, The Implied Warranty of Merchantable Quality, 27 Minn L Rev 117, 152 (1943).

Inasmuch as we have rested the case at bar on the ground that a promissory obligation was created, it is not necessary for us to decide whether the defendant's collateral promise to furnish a well would give rise to an implied warranty to produce a well suitable for the purpose for which it was constructed.

the oral agreement entered into in this case. It cannot be denied that there are a substantial number of cases in which the courts have held that oral promises and warranties are not admissible under the parol evidence rule. See for example the cases cited in 3 Corbin, Contracts, § 585 (1960) ; 3 Williston, Contracts (rev ed 1936) § 643. But many, if not most of these cases are not correctly decided and they need not embarrass us in reaching a sound conclusion upon the basis of the correct application of the parol evidence rule. The parol evidence rule is described as a rule of integration. 9 Wigmore on Evidence (3rd ed 1940) § 2425; McCormick on Evidence (1954), § 213. The rule closes the door to proof only as to those aspects of the bargain which the parties intended to memorialize in the writing. 3 Williston, Contracts (rev ed 1936) § 633. The rule is correctly stated in 1 Restatement, Contracts § 240 (1932) :

"(1) An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and

"(a) is made for separate consideration, or

"(b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract."

Whether the parties intended to integrate their agreement in the writing is a question of fact in each case.[2]

---

[2] Courts experience little difficulty in admitting evidence of written agreements collateral to a deed. Re v. Magness Construction Co., 49 Del 377, 117 A2d 78 (1955); Russ v. Lakeview Development, 133 NYS2d 641 (City Ct. 1954). Evidence of a collateral oral contract has been admitted on the same reasoning. Laurel Realty Co. v. Himelfarb, 191 Md 462, 62 A2d 263 (1948); Stevens v. Milestone, 190 Md 61, 57 A2d 292 (1948). See Bearman, Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule, 14 Vand L Rev 541, 548 (1961).

■■ In the case at bar we must determine whether the agreement to furnish a well "is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract." 1 Restatement, Contracts § 240, *supra*. The written contract which defendant contends is controlling was an earnest money agreement. It is common knowledge that such a writing purports only to seal the bargain in a rough form and that the parties do not normally include all of the refinements of the transaction in an earnest money agreement. It would seem natural for the parties to omit from an earnest money agreement such an incidental promise as that which defendant made in this case. Therefore, the trial court correctly admitted the evidence of the promise. *Becker v. Lagerquist Brothers, Inc.,* 55 Wash2d 425, 348 P2d 423 (1960).

■ Defendant raises the Statute of Frauds as a defense. The agreement relied upon by plaintiffs in the case at bar was not within the Statute of Frauds. The defendant agreed to furnish a well suitable for plaintiffs' use. This is not an agreement involving the transfer of real property; rather it is an agreement calling for defendant's services. The fact that the services are to be performed on the land and that the result bargained for relates to the use of the land does not bring the agreement within the Statute of Frauds. The use of the land is merely incidental to the performance of the promise. See *Byers v. Locke,* 93 Cal 493, 29 P 119 (1892); *Frear v. Hardenbergh,* 5 Johnson 272 (NY 1810); *Carter v. McCall,* 193 S C 456, 8 SE2d 844, 151 ALR 641 (1940). Cf., 5 Restatement, Property, Servitudes, Scope note Part III, p. 3150 (1944).

■ It is argued that the acceptance of the deed

merges all prior agreements imposing obligations upon the vendor. The law does not so operate. The deed operates as a merger only to the extent that it is intended to constitute a final memorial of the previous transaction. The rule is correctly stated in *Johnston v. Lindsay*, 206 Or 243, 248, 292 P2d 495 (1956):

> "* * * Covenants deemed to be collateral and dependent, it is said, are not destroyed by the execution of the deed, but a covenant is not so regarded if it looks to or is connected with the title, possession, quantity or emblements of the land which is the subject of the contract. In the case of a covenant regarding those matters the execution of the deed in pursuance of the contract will operate as an extinguishment of it. [citing cases]."

See also, *Van Hee v. Rickman et al*, 109 Or 357, 220 P 143 (1923).

The judgment of the lower court is affirmed.

PERRY, J., dissenting.

I regret that I am unable to concur in the opinion of the majority.

The majority, by setting forth none of the pleadings and but a scant portion of the plaintiff's testimony, by some metaphysical metamorphosis reach the conclusion that the parties agreed defendant would in the future, as a part of the sale and purchase of the property, install a well and furnish water of a quality fit for domestic purposes. A reading of the testimony will disclose no such contract and further will disclose that this court is doing what no other court has ever done, made a contract for the parties, and then found it breached.

The plaintiffs for their cause of action allege:
"* * * * *

## "III

"That as a part of said transaction defendant agreed to drill a well on said real property so as to furnish plaintiffs with a satisfactory supply of water for domestic use.

## "IV

"That defendant breached and violated the terms of said contract in that said well did not furnish a satisfactory supply of water for domestic purposes, that the water from said well was muddy and said well caved in for the reason that it was not properly cased and on account thereof plaintiffs have been and are damaged in the sum of $1,443.37."

Now, keeping in mind that plaintiff Charles O. Caldwell alone offered testimony in the cause, I set forth his statements with reference to any promises of the defendant which he claims were breached:

"Q Did you with Mr. Wells view the property you purchased and the property on which this well had been drilled?
"A Yes sir.

"Q Just tell the Court what you did in connection with that inspection?
"A Well, we went out there and looked the property over and inquired about the well; he said that it was a good well, and we went out there and all that was showing, all we could see was the casing in the well, which was sticking above the ground; we inquired about the water, the supply of water, and they have a mirrow [sic] of some sort that they reflect the sunlight down in there and we could see water in there.

"Q Did you know anything about wells, how they were constructed and so on?
"A No sir.

"Q  *We are talking about a time, are we not, before you actually purchased this property?*

"A  Yes sir.

"Q  What was said about the well as to whether it would supply sufficient water for the property or not?

"A  We inquired about that and Mr. Wells said it would produce twelve to fourteen gallons per minute, and that was sufficient enough to supply what water we needed for household use plus irrigating the lawn.

"Q  *At the time you examined this well before you signed the earnest money receipt was the well equipped with a pump?*

"A  No sir.

"Q  Who agreed to—what was the agreement so far as equipping the well with a pump?

"A  *Mr. Wells said that he would have the pump installed, and it would be all hooked up ready for use.*

"Q  By hooking it up, what had to be done in order to hook it up?

"A  *The well-house had to be dug, foundation built, the pump had to be installed and the line laid from the pump to the house to connect into the plumbing in the house.*

"Q  Mr. Wells agreed to do all that?

"A  Yes sir."

The deed from defendant to plaintiffs was executed on April 18, 1959, and plaintiffs entered into possession of the property about April 24, 1959. With reference to the water supply when plaintiffs took possession, Mr. Caldwell stated:

"Q  Was the well at the time you signed this earnest money agreement completed, had the well been completed as you say it was to be completed?

"A  No sir.

"Q  Had any part of that work been done?

"A  I don't believe so; they may have started work on digging the hole for the foundation around there.

"THE COURT: Had started what?

"THE WITNESS: Started the digging of the hole for the foundation of the pump house.

"*  *  *  *  *

"Q  Tell the Court what the condition of the well, the water from the well was at the time you took possession—strike that.  At the time you took possession had the well been equipped with a pump and hooked up and so on?

"A  Yes.

"Q  What was the condition of the water that you used or obtained from the well when you took possession?

"A  The water was cloudy, murky looking, like it had mud or settlement in it.

"Q  Did you advise Mr. Wells, the defendant, of that condition?

"A  Yes, we did.

"Q  Did he say anything to you about it?

"A  At the time he said that he had talked to the well-driller and he said that the water coming through the veins was washing the wein [sic] out and new water was coming in, and that was what they thought was causing the water to be murky.

"Q  Did they think it would clear up?

"A  Yes, they did.

"Q  What was the fact as to whether or not the well did clear up?

"A  The well never did clear completely up.

"Q  What was your experience with the water?

"A  Well, the water was continually cloudy and murky and at times we had to go to the neighbors to get water for drinking purposes.  It went on

that way for sometime, and during the hot weather it would clear up, maybe for a period of a week, never over two weeks, and then it would become cloudy and murky again.

"Q Did you advise Mr. Wells of this condition on more than one occasion?

"A Yes, I did.

"Q Did he always give you the same response as you have stated?

"A That is right.

"Q What happened to the well later on?

"A On November 6 the water supply completely stopped; I thought that possibly something had happened to the pump, so we immediately called the Pendleton Grain Growers who installed the pump. They sent a man out to check it, and he said the pump was working, but that there was no water supply there. In turn we tried to contact Mr. Wells, and he was not available at the time.

"* * * * *

"Q Did you get someone to look at the well to see what was wrong?

"A Yes sir.

"Q Who was that?

"A Mr. Dreyer.

"Q He, Mr. Caldwell, subsequently did the work that is shown on Exhibit No. 1 here?

"A Yes sir.

"Q How has the well worked since that time, since the well was completed by Mr. Dreyer?

"A It has worked perfectly ever since.

"Q The water has always been clear?

"A Yes sir.

"Q Usable?

"A Yes sir.

. "Q During the time that this water was murky you say you had to obtain drinking water from neighbors?

"A Yes sir.

"Q *And of course in November it stopped up entirely?*

"A Yes sir.

"Q No flow at all?
"A No sir."

This evidence, which, as stated, comes solely from the lips of the plaintiff Charles O. Caldwell, shows simply that before any contract was entered into the defendant made representations (assuming the words "good well" refer to quality) as to the quality and quantity of the water to come from the well, which was at that time already completed. There is no statement or evidence to show that these representations were more than inducements looking forward to the consummation of a sale of the property. Nor is there a single iota of evidence in the record from which it may be inferred that at the time of or subsequent to the formation of any contract there was an express promise with reference to the quality of the water or the condition of the well.

As shown by plaintiff's own statements, the well was dug and the casing in place before the plaintiffs agreed to purchase the property. What remained to be done was putting a foundation about the well, building the pumphouse, installing the pump, and connecting the line from the pump to the house. This latter work the defendant agreed to do. This was done, and there is no allegation or evidence that the defendant breached any part of this specific agreement.

It is elementary that, before one may establish a breach of contract, he must show a promise to be breached.

> "* * * a promise in a contract must be stated in such words either oral or written, or must be inferred wholly or partly from such conduct, as justifies the promisee in understanding that the promisor intended to make a promise." 1 Restatement, Contracts 7, § 5.

Keeping in mind the fact that, insofar as the construction of the well itself was concerned, it had been completed at the time the parties first entered into negotiations relative to the sale and purchase of the property, and the only complaint of a breach is the fact that the water was murky and some seven months after plaintiffs entered into possession of the property the well, as alleged by plaintiffs, caved in, I am unable to discover a solitary shred of evidence of an express promise to do anything in the future to see that the water from the well would not be murky or that the well would not cave in.

It may be that the representations with reference to the well were false or there was a mutual mistake of fact which would create in the plaintiffs a cause of action for redress, but the case before us deals solely with an action for breach of an express agreement.

It may be inferrible from the circumstances surrounding the transaction that there was an implied warranty as to the quality of the water. However, implied warranties of quality as to land are not enforcible unless set forth in the deed. *Steiber v. Palumbo,* 219 Or 479, 347 P2d 978.

Since there is a complete failure of proof by plain-

tiffs to establish any express promise with reference to the doing of anything to the prior established well, which promise is the basis of plaintiffs' cause of action, I would reverse the judgment.

Justice Rossman concurs in this dissent.