Argued March 7, reversed and remanded April 2, petition for
rehearing denied May 15, 1973

DeVORE ET AL, *Respondents, v.*
WEYERHAEUSER COMPANY, *Appellant.*

508 P2d 220

*Dean E. Peterson,* Tacoma, Washington, argued the cause for appellant. With him on the briefs were Proctor & Puckett and Robert D. Puckett, Klamath Falls.

*Richard C. Beesley,* Klamath Falls, argued the cause for respondents. With him on the brief was Alan Lee, Klamath Falls.

TONGUE, J.

This is a suit in equity by 45 employees of the defendant to recover wages claimed to be due because of a wage increase resulting from an industry-wide "settlement agreement" between defendant and other employers, on one hand, and the unions representing their employees. Plaintiffs' complaint also asks for an accounting for such wages. Defendant appeals from a judgment and decree in favor of plaintiffs.

Defendant contends, among other things, that although the industry-wide "settlement agreement"

was a settlement of all "industry-wide issues" between the employers and unions involved in the industry-wide negotiations which led to that agreement, it was not intended to cover so-called "local issues" at particular plants of particular employers, including the hourly rates to be paid to plaintiffs. On the contrary, defendant contends that it was specifically agreed during the industry-wide negotiations that the question of the hourly rates to be paid to plaintiffs was not covered by the industry-wide "settlement agreement," but was to be "left open" and referred back for negotiations and settlement at the "local level."

Plaintiffs contend, on the contrary, that the industry-wide "settlement agreement" was "fully integrated and closed all issues involved in negotiation"; that it was "complete and unambiguous on its face" and was assented to by the entire negotiating committee, representing both defendant and the "applicable unions"; that it was "voted on by the employees and was ratified"; that "the wage scale increase therein was clear and unambiguous" in that "all hour-rated employees (including plaintiffs) were to receive a general hourly increase plus the 'bracket adjustment,'" and that "no claim has ever been made by defendant of ambiguity."

■ From these opposing contentions it appears that the principal issues to be decided in this case relate to the application of the parol evidence rule to the facts of this case. It thus becomes necessary to review the testimony, some of which came in under an offer of testimony under ORS 17.045 (2) after the trial court had sustained plaintiffs' objection to such testimony as contrary to the requirements of the parol evidence rule;

as stated in ORS 41.740. Because this is a suit in equity we review the record de novo.[1]

## 1. *Summary of evidence.*

### a. *The previous conversion from piece work to hourly rates for "pullers."*

Prior to 1967 "pullers" on the "green chain" and "dry chain" at defendant's Klamath Falls plant were paid on a piece work basis. These piece rates were then converted to agreed hourly rates, which were computed by taking an average of compensation paid at piece rates for one year.[2] At that time there was apparently no discussion as to whether or not these men would receive any or all future wage increases, that being left for future negotiations.

It was agreed, however, that a "trial period" be established for the "green chain" crew from November 25, 1968, to May 2, 1969, at which time the agreed hourly rate would be "permanently established" unless the "average earnings" increased on the basis of the previous "contract earnings," in which event a higher hourly rate would be paid retroactively. As a result, there was some uncertainty as to the exact hourly rate to be paid to these employees in the spring of 1969.

---

[1] As in Springer v. Powder Power Tool Corp., 220 Or 102, 107, 348 P2d 1112 (1960), we find that in deciding these issues it is not necessary to choose between state law and federal law by reason of § 301 of the Labor Management Relations Act (Taft-Hartley Act), 29 USCA § 185. On the contrary, and as in *Springer* (at 107), we find that these issues may be decided by the application of general principles of contract law which presumably form a part of any body of federal law on this subject.

[2] This agreement also included the "unstacker operator" and the "unloader operator."

b. *Industry-wide wage negotiations in May and June, 1969.*

In May and June of 1969 industry-wide negotiations were conducted between the Northwest Forest Products Association, representing the employers, including defendant, and two unions representing the employees of these employers. One of these unions, the Western States Regional Council No. 3, International Woodworkers of America, represented some 20,000 employees and 20 local unions, including the employees of defendant at its Klamath Falls operation, who were members of Local No. 3-12, IWA, AFL-CIO.

Negotiations on behalf of the union were conducted by a negotiating committee which included the regional president and vice-president and three local representatives. Representatives of local unions (including Local No. 3-12) were present as "observers," but had no official capacity in negotiations.

These negotiations were conducted in Portland and were limited to industry-wide issues. The general negotiating committee was broken down into subcommittees to negotiate these various issues. One of these issues involved a "classification" or "bracket" wage adjustment and was referred to a separate subcommittee for negotiation. The "observer" for Local No. 3-12 was "aware" of that subcommittee, but did not attend any of its meetings.

c. *Work of the "Bracket Committee"—agreement that remaining local issues be settled at "local level."*

This subcommittee negotiated a "classification" or "bracket" wage increase to be paid on an agreed

"formula," depending upon the regular hourly rates of the various employees involved, and payable in addition to a general and uniform increase in hourly rates of pay of all employees. Various exceptions were also agreed upon. The results of these negotiations were then set forth in an agreed schedule, which stated the "basic formula" and its application to various hourly rates, as well as nine "exceptions."

Apparently, however, all of these "exceptions" were industry-wide in their application. At least none were designated as applying only to specified operations of specified employers. In addition, however, it was apparently agreed that a considerable number of "local issues" remained involving application of the "formula" to various job classifications at various specific operations. The negotiated written schedule made no reference to these "local issues," either individually or in any other manner. The reason for this, according to the testimony, was that all of such "local issues" were referred back to the local unions for continued negotiation and disposition. One of these "local issues" involved the "pullers" at Klamath Falls.

d. *Discussions at "Bracket Committee" meetings of "local issue" involving "pullers" at Klamath Falls.*

In the course of the meetings of the "Bracket Committee," but not as a part of any discussions by that committee, as such, defendant's industrial relations manager, Mr. Witt (a member of that committee), informed the union regional vice-president, Mr. Palmer (also a committee member), that defendant would not apply the "formula" for "bracket adjustments" to the "pullers" at its Klamath Falls operation. Mr. Palmer's

initial response was that the "formula" should apply to them.

Mr. Palmer testified that he then discussed this matter with Mr. Jarvis, the business agent for Local 3-12, who was attending the industry-wide negotiations as its "observer"; that Mr. Jarvis told him that the issues of these "pullers" was "still in grievance or still in the appeal stage at the local union level." Mr. Jarvis testified, however, that although Mr. Palmer reported this matter to him, he told Palmer that this matter had been "negotiated" and that these "pullers" should not be excluded.

In any event, Mr. Palmer then made a verbal agreement with Mr. Witt that the application of the "formula" to these "pullers" should be left "open" in the industry-wide negotiations and be referred "back to the local for an ultimate resolution in the bargaining process."

Mr. Palmer did not recall whether or not he reported that agreement at that time to Mr. Jarvis, who denied that he did so. Mr. Palmer testified, however, that he reported it to Mr. Nelson, the union regional president (who headed the union negotiating committee) and to the union members of the "bracket committee" and that they had no objection to that agreement. That committee took no formal vote on that matter, however, but apparently operated on a "consensus" basis and on that basis the written schedule was prepared setting forth the "formula" for "bracket adjustments," together with the general exceptions to that formula.

e. *Execution of industry-wide settlement agreement.*

Mr. Palmer, the regional vice-president, also testi-

fied that he reported the agreement relating to the Klamath Falls "pullers" to the union bargaining committee and that when it adopted the "settlement agreement" "the entire committee was made aware of what the situation was with regard to the pullers," but that he did not recall whether any local union "observers" were present at that time. On rebuttal, however, he contradicted this testimony and said that he so reported only to the union members of the "bracket subcommittee" and not to the full committee. When the "bracket subcommittee" made its report to the general negotiating committee, as a whole, it appears that no reference was made to the Klamath Falls "pullers."

In any event, Mr. Witt, defendant's industrial relations manager, testified without contradiction that he reported to the management negotiating committee the agreement that he had reached with Mr. Palmer with respect to these "pullers" at Klamath Falls and that it was after he did so that the final "settlement agreement" was prepared, including adoption of the recommendation of the "bracket subcommittee."

The schedule of "classification adjustments," as negotiated by the subcommittee, was then added and attached as "exhibit A" to the "settlement agreement," which was apparently adopted on June 6, 1969, by the entire joint negotiating committee without vote, but by "consensus."

The "settlement agreement" of June 6th, by its terms, provided that the negotiating parties "agree to recommend to their members the following in full settlement of all contract issues between the Parties" and includes provisions relating to wages, holidays, vacations, jury duty, health and welfare, equal employ-

ment, and call time. It also includes the following provisions for "closure of issues":

"A. All issues upon which authority to negotiate was delegated by I.W.A. Local Unions to the Western States Regional Council #3, I.W.A., and by L.S.W. Local Unions and District Councils to the Western Council, L.S.W., not covered herein, are withdrawn and closed for the term of this Agreement.

"B. Other issues opened either by Local Unions or by the Association on behalf of its Member Companies are to be deemed closed and withdrawn for the term of this Agreement if unresolved as of the time that this Settlement Agreement is accepted by the Union membership.

"C. This Settlement Agreement shall be deemed to have been accepted by the Unions:

1. By and on behalf of all I.W.A. Local Unions on the date that the Western States Regional Council #3 notifies the Association that a referendum vote conducted by the Western States Regional Council #3 has resulted in such acceptance."

It was stipulated on trial that the provisions of the "settlement agreement," if applied literally, required payment of the "classification adjustment" to the "pullers" at Klamath Falls.

As previously stated, however, there was testimony by both union and employer representatives that this agreement was intended to deal only with industry-wide issues and not to include "local issues." As also previously stated, both union and industry representatives testified that it was orally agreed that the "local issue" relating to payment of the "classification adjustment" to "pullers" at Klamath Falls was reserved

for settlement at the "local level," with the result these employees were not to receive that wage increase in addition to the over-all general wage increase to all employees.

f. *Ratification of "Settlement Agreement"—preparation of wage schedule for local working agreement.*

Copies of the "settlement agreement" were then mailed by the regional union office to all local unions with the recommendation that it be approved "as submitted" and with ballots to be returned to the council for counting. It was then approved by a vote of the union membership in the region of over 25,000 by a majority of "approximately two to one."

Before the vote of the members of Local 3-12 in Klamath Falls a meeting was held to explain and discuss the "settlement agreement." This meeting was attended by some of the "pullers" who had heard a "rumor" that they were not "covered" by "classification adjustment." The meeting was also attended by Mr. Jarvis, the union business agent.

Mr. Jarvis was asked whether there was anything in the agreement that would exclude the "pullers" from the "classification adjustment" and replied that he knew of nothing that would exclude them. At that time he apparently did not know about the "side agreement." With that assurance the Klamath Falls "pullers" voted to ratify the "settlement agreement."

Upon ratification of the industry-wide "settlement agreement," it then became necessary to include the terms of that agreement in the separate working

agreements for each local union, including Local 3-12. This also involved the preparation of a new wage schedule setting forth the new rates payable for each job classification, after including the increases resulting from the "settlement agreement."

Such a wage schedule was then prepared by defendant and delivered to Local 3-12. That schedule was then attached to the new local working agreement, but did not include the "classification adjustment" for the "pullers."

Meanwhile, however, some "pullers" were paid the "classification adjustment" in their first pay check after the "settlement agreement." Defendant claimed that those payments were made by mistake and deducted them from the next pay checks to these employees.

g. *Renewal of dispute over "pullers." Letter from union regional president stating understanding that they were excluded.*

The "pullers" then protested to defendant's foreman and superintendent, who said they could do nothing about the matter. They also talked to Mr. Jarvis, the union business agent. On July 14, 1969, Mr. Jarvis wrote a letter to Mr. Nelson, the union regional president, who had headed the union negotiating committee in the industry-wide negotiations which resulted in the "settlement agreement" of June 6th. Mr. Nelson replied by letter dated July 16th in which he stated, among other things:

"The Company did raise the question within the subcommittee dealing with classification adjustments, the problem relating to your green chain and dry chain pullers and I believe it was the under-

standing of the subcommittee members that the entire matter of rates of pay for the pullers as well as the method of pay was still in discussion at the local level and in fact still within some agreed to trial period.

"In any event, it was agreed that should the matter not be resolved satisfactorily at the local Union and Company plant level, upon being so notified, Mr. Witt for the Company and Vice-President Palmer for the Union would then review and discuss the matter in further detail."

After some further negotiations in Klamath Falls meetings were held on October 14th and December 15th in Portland. At that time the "pullers" were again told of the verbal "understanding" in June to leave the matter "open" for further negotiation. An attempt was also made to resolve the matter by negotiations at those meetings, but without success.

On January 3, 1970, Local 3-12 held a meeting to consider the filing of unfair labor practice charges against defendant on behalf of the "pullers." According to a report on that meeting by Mr. Jarvis to the regional president, by letter dated January 6, 1970:

"It was further explained that this Local Union was not in a position to file charges on the basis that all pullers should get the adjustment formula because of the fact that Western States Regional Council No. III was authorized by this Local Union to represent and negotiate in our behalf in 1969, and that in the course of negotiations, the Regional Council Negotiating Committee agreed with the employers that employees who were covered by a grandfather agreement would be excluded from application of the adjustment formula.

"I am sure that the pullers understood the position this Local Union is in as a result of the agreement that was made, however, they still strongly believe

that all pullers should receive the adjustment formula in line with the language contained in the signed 1969 settlement agreement and in light of this, the crew unanimously voted that they did not want the Local Union or the Region to file unfair labor charges in their behalf.

"In doing so, they fully intend to pursue the matter on their own behalf by filing suit against Weyerhaeuser Company. * * *"

This lawsuit was then filed.

2. *The industry-wide "settlement agreement" did, not "integrate" the oral agreement to exclude Klamath Falls "pullers."*

It is, of course, an understatement to say that the proper test or rule to be applied in determining whether, for the purposes of the parol evidence rule, a written agreement is an "integration" or "merger" of all prior or contemporaneous oral agreements is a matter subject to considerable controversy among the various courts and legal writers.

In *Caldwell et ux v. Wells,* 228 Or 389, 365 P2d 505 (1961), we stated (at p 395) that:

"* * * [t]he parol evidence rule is described as a rule of integration. 9 Wigmore on Evidence (3d ed 1940), § 2425; McCormick on Evidence (1954), § 213. The rule closes the door to proof only as to those aspects of the bargain which the parties intended to memorialize in the writing. * * *

"* * * * *

"Whether the parties intended to integrate their agreement in the writing is a question of fact in each case."

If this were the correct rule, without any further limitations, evidence could always be offered of any prior or contemporaneous oral agreement and in

all cases the question whether the parties intended to supersede such an oral agreement by the integration of their entire agreement into the terms of the written contract would be a question of fact which must always be submitted to the trier of the facts, whether court or jury. It may be said, however, with some justification, that the adoption of such a rule, without any limitations, would emasculate, if not "repeal," the parol evidence rule, which is a rule adopted by statute in Oregon, as in many other states.[9]

In *Caldwell et ux v. Wells, supra,* this court recognized the existence of such limitations to that rule by holding (at p 395) that "the rule is correctly stated in 1 Restatement 335, Contracts § 240" as follows:

> "(1) An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and
>
> "(a) is made for separate consideration, or
>
> "(b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract."

---

[9] ORS 41.740 provides as follows:

"41.740 Parol evidence rule. When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

■ Upon consideration of the entire record de novo in this case we find that the labor negotiations in May and June, 1969, were not only conducted on an industry-wide basis, but that the "settlement agreement" which resulted from such negotiations was a settlement of industry-wide issues, rather than "local issues," and that the issue relating to the "pullers" at Klamath Falls was a "local issue." Accordingly, we find that the oral agreement that this issue was to be left open for further negotiations on the local level was "such an agreement as might naturally be made as a separate agreement by the parties situated as were the parties to the written contract."

■ By the express terms of 1 Restatement, supra § 240, however, as adopted by this court in *Caldwell,* it is also required that oral agreements be "not inconsistent with the integrated contract." Thus, it is important to note that the written "settlement agreement," although perhaps limited in its substantive provisions to matters which were industry-wide issues, goes on to provide specifically that "other issues opened either by Local Unions or by the Association on behalf of its Member Companies are deemed to be closed or withdrawn for the term of this Agreement if unresolved as of the time that this Settlement Agreement is accepted by the Union membership."

In view of this provision, we cannot say that this oral agreement to leave open for further negotiations the matter of whether the "classification adjustment" would apply to Klamath Falls "pullers" was "not inconsistent" with this provision of the "settlement agreement," so as to satisfy this requirement of the rule as stated in § 240.

Another possible approach to the problem might have been to contend that the term "issues opened

either by Local Unions or the Association on behalf of its Member Companies" was either ambiguous in the legal sense or not applicable to this matter, so as to permit evidence designed to show the intended meaning of that term as applied to this matter. Cf. 3, Corbin on Contracts 412, § 579 (1960). In this case, however, no contention is made by defendant that any of the terms of the "settlement agreement" were ambiguous and it was stipulated that the terms of that agreement, if applied to the "pullers" at Klamath Falls, would require payment of the "classification adjustment" to them.

■ Conversely, however, it was admitted by plaintiff's witnesses, including union officers, if not expressly stipulated, that at the time of the industry-wide negotiations in May and June, 1969, and the execution of the "settlement agreement" there was an "understanding" between representatives of the union and the defendant that the matter of the application of the "classification adjustment" to the Klamath Falls "pullers" was to be "left open" for further negotiation at the "local level." This "understanding" was later confirmed by letter.

As stated in 3 Corbin on Contracts 451, § 582 (1960):

> "* * * [t]he oral admissions of the plaintiff that the agreement included matters not contained in the writing may be proved to show that it was not assented to as a complete integration, however complete it may look on its face. * * *"

As also stated in *Yezbak v. Croce*, 370 Pa 263, 88 A2d 80, 81 (1952), and as quoted with approval by Corbin (at 451):

> " "The parol evidence rule is based on the assumption that the written contract contains the full

and exact agreement of the parties but where admittedly it does not, the reason for the rule ceases.'"

To the same effect, see *Varriano v. Miller*, 58 NJ Super 511, 156 A2d 720, 724 (1959).

It appears that Mr. Palmer, the regional union vice-president, who entered into that "understanding" with Mr. Witt, defendant's industrial relations manager, did so pursuant to the admitted authority conferred by Local 3-12 upon the regional council "to represent and negotiate on our behalf" at the negotiations in May and June, 1969.

Accordingly, and for all of these reasons, we hold that the written "settlement agreement" was not an integration of the previously existing oral agreement to exclude these "pullers" from the "classification adjustment," pending further negotiations, and that plaintiffs are bound by that previously existing oral agreement. It follows that the judgment of the trial court must be reversed and the case remanded to it with instructions that plaintiff's complaint be dismissed.