Argued June 5, reversed July 16, 1969

# MUSTOLA, *Respondent, v.* TODDY, *Appellant.*

456 P2d 1004

*Louis E. Bonney,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

No appearance for respondent.

Before SLOAN, Presiding Justice, and O'CONNELL, GOODWIN, DENECKE* and HOLMAN, Justices.

---

* Denecke, J., did not participate in this decision.

O'CONNELL, J.

This is an action brought against a State Police officer for the conversion of plaintiff's automobile alleged to have occurred after plaintiff was arrested for intoxication on a public highway. The jury returned a verdict against defendant in the amount of $700 representing the value of the automobile and $250 punitive damages. Defendant appeals from the judgment entered on the verdict.

Plaintiff decided to drive to San Francisco to look for work. He met Don Falk, who wanted to ride to San Francisco, and eventually the two set out for California with Falk driving plaintiff's car. Later they picked up three more passengers in Portland, Al Lugo, and Joe and Lucille whose last names are not disclosed in the record. Al, Joe and Lucille were described by plaintiff as "Indians". As they proceeded on their journey they made several stops for beer. Approximately eight hours after starting their journey they were stopped by defendant, a State Police officer, about six miles north of the Coburg interchange on Interstate Highway 5. Defendant arrested Falk for driving while under the influence of intoxicating liquor and arrested plaintiff and Al Lugo for being drunk on a public highway. The events that followed were described by plaintiff as follows:

"Q * * * What did the officer say to you that you recall in regard to your car?

"A Well, he had asked me what I wanted done with it and I told him 'nothin'.

"* * * * *

"Q * * * [T]o the best of your recollection, do you recall what was said about your car at that time by the officer? * * * Apart from what you just said about it?

"A Well, he asked me if—he did ask me if that man was a friend of mine and I said, 'not necessarily.'

"Q What man was that?

"A This Joe.

"Q Was this after the officer had declared him to be the soberest one of the bunch?

"A Yes. However, I had no intention of what this man had in mind. And another thing I may add, if the man was a friend of mine I would just outright told him he was a friend of mine.

"* * * * *

"Q What did the officer do then?

"A Well, somewhere along that point there anyway he told this, this Joe, told him to take off with my car. And this Indian woman went around on the passenger side, and this Joe run up to the driver's side and he jumped in my car. I was at the back of the car when this happened, right by Toddy there, and I told him, I said, 'Well don't let them people have my car.' And he never said anything.

"Q What did you do then?

"A Well, I run up to the car, up to the driver's side, and I told this Indian fellow, I said, 'Get out,' and he wouldn't get out. About that time he started it up and he took off. There went my car down the highway, period.

"* * * * *

"Q What happened after the car took off? What did you do then?

"A After I left?

"Q Yes?

"A Well, I went back—well I run back right away to where Mr. Toddy was back there, and he was, I don't know he was talkin'. * * * I was tryin' to get his attention. I told him, I said, 'Don't let him take my car.' I said, 'I don't even know them people,' and he just wasn't payin' no attention. * * *

"* * * * *

"Q Have you seen your car since then?
"A Never."

On cross-examination plaintiff testified as follows:

"Q * * * Well, while you were all standing there, did Officer Toddy tell Joe that he could take the car?
"A He didn't tell him he could take the car. He told him to take the car.

"Q He told him to take the car?
"A Yes, and take off.

"Q Well, what was the words that he used?
"A He told him, he says, 'You are the soberest one of the bunch, take off.' And he just motioned in that manner.

"Q But he didn't say take the car?
"A On that I couldn't say he did or didn't. The words, you know, take the car. He told him, 'You are the soberest one of the bunch,' and 'take off.' The direction he pointed was right at my car, and at that point Joe run up to the passenger side and this woman around the other side of the car."

The trial court concluded that the foregoing evidence was sufficient to permit the jury to find that defendant's conduct constituted a conversion of plaintiff's automobile. We hold otherwise.

■ When the facts are undisputed it is the court's function to determine as a preliminary matter whether such facts are sufficient to permit the jury to conclude that the defendant's conduct constitutes a conversion. Accepting plaintiff's testimony as indisputedly establishing the facts, it is our opinion that the defendant's conduct did not amount to a conversion, and therefore the case should not have been submitted to the jury.

We have previously defined conversion as "any distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with

it."[1] The difficulty with this and other similar definitions commonly found in the cases is that there is no clear referent for the concept of "act of dominion wrongfully exerted over one's property."[2] As Prosser has pointed out, "[a]ll of the definitions have been either so general and so vague in their terms as to be meaningless, or so broad as to include conduct which is clearly not a conversion, or so narrow as to exclude conduct which clearly is."[3]

The first Restatement of Torts was guilty of the same semantic fault. Realizing this the drafters of the Restatement (Second) of Torts formulated the definition of conversion in terms of the factors which are important in determining whether the defendant should have imposed upon him a forced judicial purchase of the chattel with which he has interfered, or to pay only a lesser amount of damages. Section 222 A of Restatement (Second) of Torts, p. 431 (1965) reads as follows:

"§ 222 A. What Constitutes Conversion

"(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

"(2) In determining the seriousness of the interference and the justice of requiring the actor

---

[1] Lee Tung v. Burkhart, 59 Or 194, 201, 116 P 1066 (1911); Williams v. International Harvester, 172 Or 270, 141 P2d 837 (1943); Montgomery v. U. S. National Bank et al, 220 Or 553, 349 P2d 464 (1960); Gowin v. Heider et al, 237 Or 266, 386 P2d 1, 391 P2d 630 (1964).

[2] See Faust, Distinction Between Conversion and Trespass to Chattels, 37 Or L Rev 256, 263 (1958); Prosser, The Nature of Conversion, 42 Cornell L Q 162, 171 (1957).

[3] Prosser, *supra* note 2 at p. 168.

to pay the full value, the following factors are important:

"(a) the extent and duration of the actor's exercise of dominion or control;

"(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

"(c) the actor's good faith;

"(d) the extent and duration of the resulting interference with the other's right of control;

"(e) the harm done to the chattel;

"(f) the inconvenience and expense caused to the other."

We accept this new definition of conversion.[20] Applying the definition to the facts of the present case, we are of the opinion that defendant did not exercise such control over plaintiff's automobile as to justify the imposition of a forced sale upon defendant. We shall assume that when defendant commanded Joe and Lucille to "take off," he intended that they should drive off in plaintiff's automobile. When defendant gave that command he did not know what relationship existed between plaintiff and Joe and Lucille. Under the circumstances of this case defendant had the right to assume at the time he gave the command that the people in plaintiff's car were not unfriendly to plaintiff and that the possession of the car could be safely entrusted to any one of them. The car was being

---

[20] There is a strong argument for abolishing the distinction between conversion and other types of interference, such as trespass. "Perhaps the greatest clarification of the law regarding interference with the interest in possession of a chattel would result from the abandonment of the conversion measure of damages. It seems somewhat anachronistic to have to distinguish between two remedies for the same sort of wrong in a jurisdiction where the forms of action have been abolished, but this is really what the court is doing when it decides whether the defendant's interference with the plaintiff's chattel is a conversion or a trespass to chattel. Were it not for the forced sale remedy, such a distinction would be unnecessary." Faust, *supra* note 2 at pp. 270-271 (1958).

driven by Don Falk, one of the guests. Defendant could assume that if plaintiff would entrust the driving of his car to one of his guests he would entrust it to the others. There was nothing in the circumstances suggesting to defendant that Don Falk stood in any different relationship to plaintiff than the other guests in the car. The fact that some, if not all, of the occupants of the car had been drinking would further suggest to defendant that the group was bound together in some kind of camaraderie. When a police officer stops a car on the highway he should be entitled to assume, in the absence of a clear indication to the contrary, that those riding in the car together are on friendly terms and that the owner's car can be safely entrusted to any of his guests if the emergency confronting the officer makes it advisable that he do so. In the present case the officer sought to determine whether the plaintiff's guest, Joe, was his friend. Plaintiff's response "not necessarily" was ambiguous. It was plaintiff's not the officer's, obligation to resolve this ambiguity and to clarify the status of the guest. It is our conclusion, therefore, that the direction given to Joe and Lucille to "take off" did not in itself constitute such an exercise of dominion over the car as to constitute a conversion.

However, defendant later learned that plaintiff did not want Joe and Lucille to have possession of the car. According to plaintiff's version of the event, when Joe and Lucille had gotten into the car plaintiff said to defendant, "Well, don't let them people have my car," and defendant "never said anything." At this point, however, plaintiff himself exercised dominion over his car. He testified that he "run up to the car on the driver's side and I said, 'get out' and he wouldn't get out." To hold that defendant was liable

for conversion after this effort on the part of plaintiff to regain control over his car it would be necessary for us to treat defendant's direction that Joe and Lucille "take off" not only as a direction to take plaintiff's car but as a command that the car be taken even though plaintiff wished to have the car remain where it was. We do not think that defendant's statement can reasonably be given this interpretation.

■■ Even if it could be said that defendant exercised a continuing dominion over the car until it was driven away, it was not such an exercise of dominion "which so seriously interferes with the right of control that the [defendant] may justly be required to pay the [plaintiff] the full value of the chattel." This formulation of the definition of conversion limits the tort to those cases in which the defendant may *justly* be required to pay full value. In determining the justness of the imposition of this burden on a defendant we are to consider the factors enumerated in subsection (2) of Section 222 A, Restatement (Second) of Torts. And we are informed by comment d to this section that the factors listed in subsection (2) "are not intended to be exclusive." There is a factor not listed in subsection (2) which, we think, is controlling in the present case. That factor is the desirability of permitting police officers acting in emergency situations to have sufficient leeway in dealing with property coming under their control as an incident to law enforcement that they are not unduly inhibited in carrying out their duties. This is a part of the larger problem of establishing the scope of the privilege or immunity for governmental officers.[9]

---

[9] See 3 Davis, Administrative Law Treatise, § 26 (1958); 2 Harper & James, The Law of Torts, § 29 (1956); Prosser, Law of Torts (3d ed 1964) § 126.

The problem is concisely stated in 2 Harper & James on Torts, § 29.10, pp. 1640, 1641-42 (1956):

"Wherever suit is brought against an individual officer because of his official conduct, the court must consider the practical effects of liability and make a value judgment between the social and individual benefit from compensation to the victim, together with the wholesome deterrence of official excess, on the one hand, and, on the other hand, the evils that would flow from inhibiting courageous and independent official action, and deterring responsible citizens from entering public life. The rule of immunity of officers for discretionary acts, and its extension, represent a judgment that the benefits to be had from the personal liability of the officer (especially since the prospect of actual compensation to the victim from that source is slight) are outweighed by the evils that would flow from a wider rule of liability. * * * [I]f personal liability may be visited upon officers who have acted in accordance with their apparent commands and their best judgment in these matters, we are indeed likely to breed a race of do-nothing officials. * * *"[⑥]

According to the common law tradition a police officer is not invested with immunity of the sovereign which he serves. He may, however, have a privilege to act which were it not for his official status would subject him to liability.[⑦]

■ It has been strongly urged that the scope of the police officer's immunity be expanded for various reasons including those mentioned in the quotation

___

⑥ See also 3 Davis, Administrative Law Treatise, § 26.03 (1958).

⑦ 3 Davis, Administrative Law Treatise, § 26.03, p. 520 (1958); 2 Harper & James, The Law of Torts, § 29.10 (1956); Prosser, Law of Torts (3d ed 1964) § 25.

above.[9] It is not necessary for us to re-examine generally our cases on the immunity of public officers in light of this criticism. We need only take note of the point made in the argument for the general immunity of public officers that law enforcement should not be unduly inhibited by the officer's fear of personal liability. This consideration is, in our opinion, sufficient to prompt us to confine the scope of the tort of conversion to its narrowest possible limits when a police officer in an emergency situation exercises control over the arrestee's property. It is our conclusion that defendant acted reasonably under the circumstances which confronted him and that since he did so act he cannot "justly be required to pay" the value of plaintiff's car which was stolen by others.

The judgment is reversed.

---

[9] Davis, *supra;* Harper & James, *supra;* Mathes and Jones, Toward a "Scope of Official Duty" Immunity for Police Officers in Damage Actions, 53 Geo L J 889 (1965).