Argued January 22, reversed April 2, reconsideration
denied May 2, petition for review allowed June 26, 1979

DICKENS, *Respondent,*
*v.*
DE BOLT, *Appellant.*
(No. L-6275, CA 11338)

592 P2d 1082

W. Benny Won, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Mike Kilpatrick, Mt. Vernon, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Thornton, Lee and Gillette, Judges.

GILLETTE, J.

**GILLETTE, J.**

This was an action for conversion of a sturgeon and a water ski rope belonging to plaintiff. Defendant is a state police officer. A jury returned a verdict for $250 compensatory and $750 punitive damages. From the resulting judgment, defendant appeals. We reverse.

On Saturday, September 10, 1977, plaintiff, his uncle and their wives went fishing on the Columbia River at a pump platform below John Day Dam. At sunset plaintiff caught a 43 1/2-inch sturgeon. He estimated that it weighed 40-45 pounds. He tied one end of a water ski rope through the sturgeon's gills, put the fish back into the water, and tied the other end of the rope to a nearby cable. Plaintiff left the sturgeon in the water in order to preserve it, as he did not intend to go to his home in Mount Vernon, Oregon, until the next day.

Roy Golden, his son Rans, and another man, Gregory Elliot, also were fishing for sturgeon from the pump platform at that time. They were staying in a motor home parked within sight of the platform. Plaintiff asked them if they would watch his sturgeon and they agreed to do so. Plaintiff's party then went to Rufus and stayed overnight in a motel there.

Defendant, a state police officer assigned to the Fish and Game Division, was on duty that evening. While patrolling the John Day Dam area more than an hour after sunset, he observed two persons angling from the pump platform. Defendant moved to within 50 yards of the platform and watched the anglers through field glasses. Although it was dark outside at that time, he was able to see what was going on because there was a bright mercury vapor light near the platform. Shortly after 10 p.m., defendant saw one of the anglers, later identified as Rans Golden, catch a sturgeon approximately three feet in length. A third person, later identified as Roy Golden, came down to the pump platform and helped Rans Golden land the fish. After the fish had been landed, Roy Golden went

[577]

to the motor home and returned with a rope. He tied one end of the rope through the gills of the fish, walked to the front edge of the platform, and appeared to tie the other end of the rope to one of the cables there.

Defendant then approached the two anglers on the pump platform, Rans Golden and Gregory Elliot. He observed that Elliot's fishing line was still in the water, while Rans Golden's fishing pole was leaning against the railing of the platform. The line was hanging loose, with no hooks or weights attached to it. Defendant looked over the front edge of the pump platform and found a sturgeon tied to a cable in about the same location where he had observed Roy Golden tie a sturgeon. He also found a length of fishing line, with a hook and a rock tied to it, in the sturgeon's mouth. The line appeared to be similar to the line on Rans Golden's tackle; he did not observe any other sturgeon around the pump platform.

Defendant issued citations to Rans Golden and Gregory Elliot for Angling During Prohibited Hours. They told him that they were fishing for catfish and that the sturgeon belonged to a person from John Day who was staying at a motel in Rufus. Defendant did not believe their story because of what he had observed earlier. He seized the sturgeon as evidence of the violations charged.[1] Defendant told Rans Golden and Gregory Elliot to tell the alleged owner of the fish to call the state police office in Arlington.

Defendant took the sturgeon to Harold Jordan in Arlington, whom defendant knew was familiar with sturgeons. The fish was filleted and wrapped. The package of meat weighed approximately eight pounds. The package was marked with a state police evidence tag as "Lot No. 25." Defendant then took the package of meat home and stored it in his freezer, because the

---

[1] Rans Golden and Gregory Elliot ultimately forfeited bail on the citations.

state police office in Arlington did not have such facilities.

On Sunday morning, September 11, 1977, plaintiff returned to the pump platform. He discovered that the water ski rope had been cut and the sturgeon was gone. Roy and Rans Golden told plaintiff that a police officer had come by and taken the fish and that plaintiff was to contact the state police in Arlington if he wanted the fish back. Plaintiff called the desk sergeant in Arlington and told him that there were witnesses who had seen plaintiff catch the sturgeon. According to plaintiff, the desk sergeant stated that if the alleged witnesses went to court, they could go to jail for perjury. Plaintiff did not recover the fish or the water ski rope.

Plaintiff filed this action alleging that defendant "wilfully, unlawfully and maliciously" took plaintiff's property and converted it to his own use. In his answer, defendant admitted taking the sturgeon but denied the plaintiff's other material allegations. Defendant also set up two affirmative defenses:

> "At all times material herein, defendant was acting in his official capacity as a trooper of the Oregon State Police, and seized said sturgeon and water ski rope as the fruits of a crime and at the time of and pursuant to a valid arrest.
>
> "* * * *
>
> "At all times material herein, defendant, a trooper of the Oregon State Police, was performing a discretionary function."

Defendant makes three assignments of error. We reach only the first, which is that the trial court erred in denying his motion for a directed verdict.

Under this assignment, defendant first contends that he is immune from liability pursuant to ORS 496.620, which provides:

> "No person authorized to enforce the wildlife laws shall suffer any civil liability for the enforcement or attempted enforcement of any provisions of the wild-

life laws or for the exercise or attempted exercise of any of the duties or privileges granted to or imposed by law upon * * * such persons."

All of the evidence established that defendant was, at the time of the incident in question, a person authorized to enforce and attempting to enforce the wildlife laws. He had seen a sturgeon caught at a time when it was illegal to take sturgeon.[2] Elliot's testimony confirms this. Seizure of the sturgeon as evidence was a proper activity in connection with the citations defendant issued. The wrong fish was seized because Elliot and the Goldens did not point out to defendant where the right fish was.

ORS 496.620, *supra*, is designed to prevent civil actions from having a chilling effect on the vigorous enforcement of the game laws. *Cf. Mustola v. Toddy*, 253 Or 658, 666-68, 456 P2d 1004 (1969).

Plaintiff, however, argues that ORS 496.620 applies only to a *good faith* act of a police officer. Here, plaintiff argues, the jury was entitled to find that there was an unexplained shrinkage in the amount of sturgeon still available at the time of trial, which shrinkage would permit the inference that the officer had eaten a portion of the fish and the further inference that the officer intended to do so when he seized the fish. We agree that the evidence permitted such inferences.

■ We hold, however, that ORS 496.620 extends to acts of the kind complained of here even when those acts are taken in bad faith. We reach our conclusion concerning ORS 496.620 based in part upon its own absolute language and in part upon the language of the Oregon Tort Claims Act, ORS 30.265.

---

[2] OAR 635-30-028 provides, in pertinent part:

"It is always unlawful:

"* * * *

"(7) To angle at any time between one hour after sunset and one hour before sunrise unless specifically permitted."

The ORS 496.620 exemption from liability does not mention "good faith". It exempts "* * * [the] exercise of any of the duties or privileges granted to or imposed by law upon [officers like defendant]." A fuller grant of immunity can hardly be imagined. To permit an allegation of wilfullness, or the existence of evidence from which wilfullness might be inferred, to defeat the statute would render the statue meaningless.

We draw support for this conclusion from the construction which has been given the less particularized language of ORS 30.265 (3)(c), which provides:

"* * * *

"(3) Every public body and its officers, employes and agents acting within the scope of their employment or duties are immune from liability for:
"* * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

■■ In determining whether an officer is immune for his discretionary acts under ORS 30.265 (3)(c), his "good faith" is irrelevant. *Chemical Waste Stor. v. Day/Mann*, 14 Or App 515, 513 P2d 1193, rev den(1973); *Donahue v. Bowers/Steward*, 19 Or App 50, 526 P2d 616, *rev den* (1974). In other words, there exists at least a strong argument that what the officer did was immune under the more general statute, ORS 30.265(3)(c). Yet the legislature is presumed to mean something different by the language of ORS 496.620, or there would be no reason to enact it. Something different in this context must involve greater protection to the officer whose acts are later called into question. "Bad faith," therefore, cannot be permitted to defeat immunity under ORS 496.620 when it would not defeat immunity under ORS 30.265(3)(c).

Defendant was immune from liability for his actions in this case, and his motion for a directed verdict should have been granted.

Reversed.