114

Submitted April 6, 2012, reversed and remanded February 6, 2013

Gary B. CRON,
Geri L. Everson,
Sandee Leitheiser,
and Shane Hale,
*Plaintiffs-Appellants*,

*v.*

Shawnita ZIMMER,
*Defendant-Respondent.*

Lane County Circuit Court
160814132; A142540

296 P3d 567

Geri L. Everson filed the brief *pro se*. Gary B. Cron, Sandee Leitheiser, and Shane Hale joined the brief *pro se*.

George W. Kelly filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiffs appeal from a general judgment dismissing their interference with economic relations, conversion, and unjust enrichment claims. Plaintiffs assign error to the trial court's grant of defendant's motion for summary judgment. Because we conclude that plaintiffs demonstrated sufficient evidence for a trial on their interference with economic relations, conversion, and unjust enrichment claims, we reverse and remand.

We state the facts in the light most favorable to the nonmoving party, plaintiffs in this case, to determine whether there are any genuine issues of material fact and whether defendant is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Plaintiffs and defendant are siblings. Their mother, Conlin-Hutton, owned mineral rights to real property located in North Dakota. She intended to give the mineral rights to her five children in equal shares, but she died intestate in January 2006. Defendant was appointed the personal representative of her estate. Conlin-Hutton's husband, Hutton, inherited all of her estate, including the mineral rights in North Dakota. In May 2006, shortly after receiving the mineral rights, Hutton conveyed the rights to defendant for $1 and "other good and valuable consideration." Approximately two years later, plaintiffs Cron and Everson called Hutton and told him that the mineral rights that he had conveyed to defendant were worth $30,000. After speaking to Cron and Everson, Hutton signed an affidavit in March 2008 that Everson prepared. Hutton's affidavit stated that he had conveyed the mineral rights to defendant so she could set up a trust to benefit all of the siblings:

> "I, Harold Hutton, signed over the mineral rights of Betty Ann Conlin-Hutton to [defendant] with the intent that these mineral rights were to go to all five of [Conlin-Hutton]'s children. They were given to [defendant] to administer until the estate was settled and a trust could be established because she was living right across the street from me which allowed expedition of the transfer. The intent was clear[ ] and always that all five of the children

would get an equal portion of any and all of the mineral rights."

Shortly thereafter, plaintiffs filed three claims against defendant for her refusal to account to plaintiffs for their share of the proceeds derived from the mineral rights: (1) interference with economic relations; (2) conversion; and (3) unjust enrichment. Specifically, plaintiffs alleged in their complaint that:

"6.

"It was the intention of Harold Hutton at the time he deeded the Mineral Rights to Defendant, that Defendant place the mineral rights into a trust which would own the mineral rights, receive any revenue generated by them, and distribute the proceeds in equal shares to each of Betty Ann Conlin-Hutton's five children.

"7.

"Prior to the transfer from Harold Hutton to Defendant, Defendant was aware of Harold Hutton's intention that the trust be created. Prior to the transfer, Defendant promised Harold Hutton she would create such a trust if Harold Hutton deeded the Mineral rights to her.

"8.

"Defendant's promise induced Harold Hutton to deed the Mineral Rights to her.

"9.

"Defendant has failed and repeatedly refused to create the trust Betty Ann Conlin-Hutton and Harold Hutton intended."

For all three claims, plaintiffs sought 80 percent of the revenue that defendant derived from the minerals on the property. They alleged that defendant had already received approximately $15,000 from the mineral rights. With respect to the unjust enrichment claim, plaintiffs also sought an accounting and injunctive relief compelling defendant to place the mineral rights into a trust, with the trustee to

be selected by the court, so that future proceeds will be distributed in equal shares to the five siblings.[1]

After depositions, defendant moved for summary judgment on all three of plaintiffs' claims. In essence, defendant argued that there was no issue of material fact concerning Hutton's intent to convey the mineral rights to defendant outright. Despite plaintiffs' allegations and Hutton's March 2008 affidavit, defendant asserted that plaintiffs did not provide evidence that Hutton intended that defendant set up a trust to distribute the revenues from the mineral rights associated with the property to all of the siblings. Without that intent, defendant reasoned, plaintiffs could not establish that defendant interfered with an economic relationship between Hutton and plaintiffs, converted plaintiffs' chattel, and was unjustly enriched. Thus, defendant concluded that, as a matter of law, she was entitled to summary judgment in her favor.

To support her motion, defendant presented excerpts of Hutton's deposition contradicting plaintiffs' allegations, as well as an August 2008 affidavit by Hutton in which he disavowed his sworn statements in his March 2008 affidavit. During Hutton's deposition, he said that he did not want the mineral rights because the rights generated approximately $60 per quarter and were not worth his time to manage. He conveyed the rights to defendant because she had been so helpful to him in his day-to-day life. Hutton said that all the allegations in plaintiffs' complaint concerning his intent to convey the mineral rights were false. He also disavowed the affidavit that Everson prepared and Hutton had signed, saying that he was coerced into signing it.

Plaintiffs responded by arguing that Hutton's initial sworn statements in his first affidavit produced an issue of material fact concerning his intent. In support of their allegations, plaintiffs submitted Hutton's affidavit,

[1] Plaintiffs appear to request that the court impose a constructive trust on the mineral rights to prevent unjust enrichment. A request for imposition of a constructive trust cannot stand on its own as a substantive claim, "but exists solely as an equitable remedy, available to divest an individual who has been unjustly enriched of property that he or she 'ought not, in equity and good conscience, hold and enjoy.'" *Tupper v. Roan*, 349 Or 211, 219, 243 P3d 50 (2010) (quoting *Marston v. Myers et ux*, 217 Or 498, 509, 342 P2d 1111 (1959)) (emphasis omitted).

as well as excerpts from plaintiffs' depositions, about conversations that they had had with defendant and Hutton shortly after Conlin-Hutton's funeral concerning Hutton's intent to convey the mineral rights. Plaintiff Everson stated that the defendant and Hutton had told her that Hutton conveyed the mineral rights to defendant "for the purpose of [defendant] taking control on our behalf, for all five of us children." Everson also testified that, based on the conversations she had with defendant, defendant knew that their mother wanted the mineral rights to be divided equally among all the children. Everson explained that defendant had told her that the reason Hutton did not simply convey the mineral rights to all five children was because a North Dakota attorney advised defendant to put one person on the deed and to let that person set up a trust to distribute the proceeds from the mineral rights. Thus, plaintiffs argued, Hutton transferred the mineral rights with the understanding that defendant would set up a trust, but defendant did not set up the trust or distribute any money derived from the property.

The trial court granted defendant's motion for summary judgment and this appeal followed. Plaintiffs appeared *pro se* and moved in this court for a determination as to whether Oregon courts have subject matter jurisdiction given that the mineral rights relate to real property located in North Dakota.[2] The Appellate Commissioner, and the Motions Department, considered the motion but concluded that Oregon courts have jurisdiction over all of plaintiffs' claims and that the appeal can continue in this forum.

On appeal, plaintiffs raise three assignments of error. First, plaintiffs raise an unpreserved assignment of error in which they contend that the trial court failed to consider intestate succession law under ORS 112.025; we reject it without discussion. Second, plaintiffs argue that the trial court erred in granting defendant's motion for summary judgment. Finally, plaintiffs reassert that the

---

[2] We note that, although plaintiffs did not challenge the court's jurisdiction over the claims at trial, parties may raise a question as to subject matter jurisdiction for the first time on appeal. *See, e.g., Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 384, 8 P3d 200 (2000), *adh'd to on recons*, 331 Or 595, 18 P3d 1096 (2001).

Oregon courts lack jurisdiction to adjudicate matters of real estate outside of Oregon. Before discussing the trial court's summary judgment ruling, we first address plaintiffs' challenge to the jurisdiction of Oregon courts to adjudicate the case because the minerals at issue are located on property in North Dakota.

Oregon courts are precluded from exercising subject matter jurisdiction over recovery of real property located outside the state. *Claude v. Claude*, 191 Or 308, 335, 228 P2d 776, *on reh'g*, 230 P2d 211 (1951). The general rule is codified in ORS 14.030, which provides, "When the court has jurisdiction of the parties, it may exercise it in respect to any cause of action or suit wherever arising, *except for the specific recovery of real property situated without this state*, or for an injury thereto." (Emphasis added.) In Oregon and North Dakota, all interests in mineral rights are real property. *See* ORS 517.080 ("All mining claims, whether quartz or placer, are real estate. The owner of the possessory right thereto has a legal estate therein * * *."); *Schulz v. Hauck*, 312 NW2d 360, 361 (ND 1981) (holding that mineral interests are real property). Claims for personal property, such as money damages, are transitory in nature, and ORS 14.030 does not prohibit the exercise of jurisdiction. *Novich v. McClean*, 172 Or App 241, 245, 18 P3d 424, *rev den*, 332 Or 137 (2001).

In this case, plaintiffs primarily seek money damages. The exception to subject matter jurisdiction in ORS 14.030 for "the specific recovery of real property situated without the state" does not apply to plaintiffs' claims for interference with economic relations and conversion, in which they seek only money damages. Nor does it apply to the portion of plaintiffs' third claim for unjust enrichment in which they seek money damages.

In their third claim, however, plaintiffs also seek equitable relief, specifically, a judgment compelling defendant to convey the mineral rights in the North Dakota property to a trust. Although that request for relief may suggest that plaintiffs seek "specific recovery of real property situated without the state," such relief, if granted, would act only on the person of defendant, and not directly

on the title to the mineral rights. When courts in equity have jurisdiction over the parties, it may "administer full relief without regard to the nature or situation of the property involved, and may compel action with respect to land which lies beyond its jurisdiction[.]" *Blue River Sawmills, et al, Ltd. v. Gates, et al*, 225 Or 439, 476, 358, P2d 239 (1960); *see also Claude*, 191 Or at 335 ("The court * * * is without power to act directly upon the titles [of real property outside of Oregon], but it is well settled that in a proper case equity may enter its decree *in personam* and thereby accomplish indirectly the desired result.").

Illustrative of this point is *Berger v. Loomis*, 169 Or 575, 131 P2d 211 (1942). In *Berger*, the defendant fraudulently conveyed real property in Illinois to a codefendant corporation to prevent the plaintiff, who was a judgment creditor, from obtaining the property. The plaintiff filed a creditor's suit against the defendants and asked the court to compel the defendant corporation to convey the property to a court-appointed receiver who would sell the property and distribute the proceeds to the plaintiff to satisfy the judgment. *Id.* at 577. The Supreme Court recognized that Oregon courts could not affect the title of the Illinois real property directly. *Id.* at 586. But, after surveying cases from other jurisdictions, it concluded that courts of equity can indirectly act upon real property located outside the state by exercising the court's authority over the owners who are within the court's jurisdiction. *Id.* 586-92. Ultimately, because the trial court was acting upon the defendants and not the property, the Supreme Court affirmed the trial court's ruling compelling the defendant to convey the Illinois property to a court-appointed receiver for sale and satisfaction of the judgment debt. *Id.* at 592-93.

Here, in their third claim for relief, plaintiffs seek relief directed at defendant that is similar to the relief sought in *Berger*. Plaintiffs request that the court compel defendant to convey the mineral rights to a court-ordered trust to distribute the future proceeds of the mineral rights to each sibling in equal shares in accordance with their mother's plan and Hutton's intent when he conveyed the rights. Plaintiffs do not seek the mineral rights themselves

and are not requesting that the court compel defendant to convey the property to them. Rather, they are requesting their share of the *proceeds* from those mineral rights. The court would not be directly exercising its authority over the mineral rights related to the North Dakota property, but rather over defendant and defendant's entitlement to the future proceeds from the mineral rights. Accordingly, we conclude that this court has jurisdiction over all of plaintiffs' claims.

With respect to plaintiff's second assignment, as explained below, we conclude that the trial court erred in granting defendant's motion for summary judgment because there are issues of material fact concerning whether Hutton intended to convey the mineral rights to defendant to set up a trust for the siblings' benefit. We review each of plaintiffs' three claims to determine whether defendant is entitled to judgment as a matter of law. *Aylett v. Universal Frozen Foods Co.*, 124 Or App 146, 148, 861 P2d 375 (1993).

Before discussing each claim, we first address defendant's assertion that, because the deed was an integrated agreement, the parol evidence rule prohibits plaintiffs from relying on evidence that Hutton had made an arrangement with the plaintiffs and defendant to convey the mineral rights to defendant to set up a trust for all the siblings.[3] The parol evidence rule is a common-law rule that has been codified in ORS 41.740. *Wirth v. Sierra Cascade, LLC*, 234 Or App 740, 771, 230 P3d 29, *rev den*, 348 Or 669 (2010) (citing *Abercrombie v. Hayden Corp.*, 320 Or 279, 286, 883 P2d 845 (1994)). In part, ORS 41.740 provides:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties * * *, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings

---

[3] We note that we are not presented on appeal with the issue that was present in *Connall v. Felton*, 225 Or App 266, 201 P3d 219, *rev den*, 346 Or 257 (2009), as to whether an outright conveyance was intended to be a conveyance in trust. Plaintiffs do not contend that the conveyance of the mineral rights was intended to be in trust; rather, they contend that the outright conveyance was intended as the first step toward the creation of a trust.

or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates * * *, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

The parol evidence rule is a not a rule of evidence, but a rule that declares that certain kinds of facts are legally ineffective in the substantive law. *Abercrombie*, 320 Or at 286. Generally, if a written agreement is completely integrated—that is, if the parties intended the writing to be the final and exclusive expression of their agreement— then the parol evidence rule prohibits evidence of prior agreements purporting to add to, subtract from, alter, or contradict terms of the written agreement. *Id.* at 288.

The trial court, and not the factfinder, determines whether the parties intended the writing to be completely integrated, partially integrated, or not integrated at all. *Id.* at 289. We review that conclusion for legal error. *Loverin v. Paulus*, 160 Or App 605, 610, 982 P2d 20 (1999). In this case, the trial court did not make any explicit finding regarding whether the writing—the deed—was an integrated agreement. However, on this summary judgment record, the court could not have concluded that the deed was fully integrated.

An agreement is not fully integrated, and the parol evidence rule does not bar evidence of prior oral agreements, if the prior oral agreement is (1) consistent with the subsequent writing and (2) the prior oral agreement is the kind of agreement that would naturally be made separately from the deed. *Hatley v. Stafford*, 284 Or 523, 528, 588 P2d 603 (1978) (adopting *Restatement of Contracts* § 240 (1932)); *accord Restatement (Second) of Contracts* § 216 (1979). A prior agreement is consistent with the subsequent writing unless it "contradicts or negates an express term in the writing." *Abercrombie*, 320 Or at 289.

Generally, a "deed of conveyance is not ordinarily intended as the integration, or complete expression, of the terms of an agreement between grantor and grantee[,]" but, instead is "merely the execution of a performance that was

provided for in such an agreement." Arthur L. Corbin, 3 *Corbin on Contracts* § 586, 491 (1960). In *Caldwell, et ux v. Wells*, 228 Or 389, 390, 365 P2d 505 (1961), the Supreme Court focused on agreements that might naturally be omitted from a deed. The plaintiff in that case agreed to buy a house from the defendant, provided that the defendant would place a well on the lot. The parties executed a one-page "Earnest Money Receipt" that made no mention of the oral promise to install a well. The deed also did not mention the oral promise. The Supreme Court held that the oral promise to drill a well was a separate agreement that might naturally be made separately from the deed. *Id.* at 396-97.

In this case, we conclude that the deed was not fully integrated and, to the extent that the trial court ruled otherwise, it erred. First, the purported trust arrangement was consistent with the terms of the deed. The deed simply stated that Hutton would convey his wife's interest in minerals on the North Dakota property to defendant in exchange for $1 and other good and valuable consideration. According to plaintiffs, the arrangement between Hutton and the siblings contemplated defendant's ownership of the mineral rights, albeit temporarily, in order to set up a trust to benefit all of the siblings. The deed could simply be, as plaintiffs have argued, a partial implementation of the broader arrangement to set up a trust to divide the proceeds from the mineral rights. Thus, the additional term does not contradict an express term of the deed.

Second, Hutton's and the parties' purported trust arrangement is the type of arrangement that would naturally be omitted and separate from the deed. Similar to the arrangement of the parties in *Caldwell*, the deed made no mention of a prior promise to do some act associated with the property, and the prior promise appears to be a collateral agreement to the deed. In addition, the purported trust arrangement between Hutton and the siblings is an arrangement between family members that is likely to be less formal and not reduced to writing in a deed. For those reasons, we conclude that the arrangement is the kind of arrangement that might naturally be excluded from the deed. Accordingly, the deed was partially integrated, and

the parol evidence rule does not prohibit evidence of the arrangement Hutton had made with the siblings.

Having determined that the parol evidence rule does not prohibit evidence that Hutton had an arrangement with the parties to set up a trust for the siblings, we must determine whether plaintiffs adduced evidence to support each of the three claims for relief. We begin with plaintiffs' interference with economic relations claim. Interference with economic relations requires the plaintiff to prove six elements:

> "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995). On appeal, defendant argues that the evidence was insufficient to establish the first, second, and fourth elements. For the following reasons, we disagree.

With regard to the first element, we must determine whether plaintiffs' economic relationship with Hutton is the type of relationship protected by the tort of intentional interference with economic relations. Generally, commercial and contractual relationships enjoy the protection of the tort. *Allen v. Hall*, 328 Or 276, 281, 974 P2d 199 (1999). However, a defendant can be liable for interference "even though the arrangement interfered with does not rise to the dignity of a contract." *Luisi v. Bank of Commerce*, 252 Or 271, 275, 449 P2d 441 (1969); *see, e.g., Aylett*, 124 Or App at 152, (allowing potato growers to bring a claim against the defendant buyer for interfering with potato growers' *prospective* economic relationship with another buyer). "[T]he tort also may, by a reasonable and principled extension, be made applicable to some *noncommercial* relationships and prospects[.]" *Allen*, 328 Or App at 281 (emphasis in original). In *Allen*, the Supreme Court answered a certified question from the Ninth Circuit regarding whether Oregon law recognizes the tort of intentional interference

with prospective inheritance. *Id.* at 278. The Supreme Court concluded that "an expectancy of inheritance is an interest that fits by logical extension within the concept underlying the tort of intentional interference with prospective economic advantage * * *." *Id.* at 282. To be sure, this case is not an interference with a prospective inheritance case because plaintiffs did not allege that defendant interfered with Conlin-Hutton's will or prevented her from executing a will conveying the mineral rights to plaintiffs. Rather, the issue here is whether, as a matter of law, Hutton's intention to convey the mineral rights to defendant so that she could set up a trust to distribute the proceeds to both herself and plaintiffs creates the type of economic relationship or prospect protected under the tort of interference with economic relations.

On that issue, our holding in *Fox v. Country Mutual Ins. Co.*, 169 Or App 54, 75, 7 P3d 677 (2000), *rev den*, 332 Or 137 (2001), is instructive. In that case, the passenger in a truck was killed during a staged automobile accident. The plaintiff was the personal representative of the passenger's estate and filed a wrongful death claim against the driver and the driver's insurer. The defendant, the passenger's insurance company, misrepresented the amount of the passenger's policy limits to the plaintiff. The plaintiff settled with the driver and driver's insurer based on that misrepresentation. When the plaintiff discovered the misrepresentation, he filed an interference with economic relations claim against the defendant, alleging that the defendant's misrepresentations interfered with the ongoing litigation between the plaintiff and the driver's insurer. The issue on appeal was whether "the economic relationship alleged in plaintiff's complaint, *viz.*, 'the economic advantages and relations contained in the lawsuit [between the passenger's estate and the insurer],' is a business relationship or expectancy for purposes of the tort of intentional interference with economic relations." *Id.* at 72. We noted that the Supreme Court in *Allen* extended the application of the tort of intentional interference with economic relations "'to some *noncommercial* relationships and prospects.'" *Id.* at 74 (quoting *Allen*, 328 Or at 281) (emphasis in *Allen*). However, we declined to extend the

tort to civil lawsuits, because it conflicted with the purpose of the tort. The essential purpose of the tort is "[t]o protect the integrity of *voluntary* economic relationships, both commercial and noncommercial, that would have very likely resulted in a pecuniary benefit to the plaintiff but for the defendant's interference." *Fox*, 169 Or App at 75 (emphasis added). We concluded that a civil lawsuit, by nature, is an involuntary relationship between the opposing parties, and thus, does not represent the kind of noncommercial relationship and prospective economic advantage protected by the tort of interference with prospective economic relations. In summary, to satisfy the existence of an economic relationship element, a plaintiff must establish a *voluntary* relationship with another party that would have very likely resulted in a pecuniary benefit for the plaintiff but for the defendant's interference.

Applying that analysis to this case and viewing the evidence in plaintiffs' favor, there is evidence that plaintiffs and Hutton formed a voluntary prospective economic relationship that would have resulted in a pecuniary gain for plaintiffs. Plaintiffs presented evidence that Hutton wanted to carry out his wife's wish that all five of her children benefit equally from the mineral rights.[4] To carry out that wish, Hutton conveyed the rights to defendant so that she could set up a trust that would have distributed the proceeds from the mineral rights to plaintiffs and defendant. Based on that testimony, plaintiffs established a noncommercial relationship between plaintiffs and Hutton that would have produced a pecuniary benefit for plaintiffs.

---

[4] Although there are competing, inconsistent versions of Hutton's testimony in support of and in opposition to summary judgment, no party has argued that Hutton's later sworn statements, which contradict the first sworn statement he made that supports plaintiffs' version of events, cannot be considered at summary judgment as sham. *See Taal v. Union Pacific Railroad Co.*, 106 Or App 488, 494, 809 P2d 104 (1991) ("[A] later sworn statement cannot create a question of fact by contradicting an earlier one on a factual issue if the inconsistency is not explained or if there was no confusion at the time of the earlier statement." (Emphasis omitted.)). That is probably so because Hutton gave an explanation for disavowing his initial sworn statement, and plaintiffs did not move for summary judgment on their own claims. *See id.* ("There is no reason why contradictory evidence from the same party or witness is less capable than inconsistent evidence from separate sources to create a disputed fact question. It is the factfinder's role to decide which is true.").

Plaintiffs also provided evidence from Everson's deposition to satisfy the second element, that defendant intentionally interfered with a relationship between Hutton and plaintiffs, and the fourth element, that she did so for an improper purpose. According to Everson's deposition, Hutton wanted to carry out his wife's wishes for the five siblings to receive benefits from the mineral rights in equal shares; plaintiffs and Hutton had arranged for Hutton to convey the mineral rights to defendant so that she could set up a trust to divide the proceeds from the mineral rights to all the siblings; and defendant interfered with that arrangement by failing to set up the trust and keeping the proceeds from the mineral rights for herself. Based on those facts, plaintiffs produced sufficient evidence to establish the second and fourth elements. Accordingly, we conclude that the trial court improperly granted defendant's motion for summary judgment on the interference with economic relations claim.

With respect to plaintiffs' conversion claim, we conclude that the trial court improperly dismissed it. To succeed in a conversion claim, the plaintiff must prove "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Mustola v. Toddy*, 253 Or 658, 663, 456 P2d 1004 (1969) (adopting the definition of conversion found in *Restatement (Second) of Torts* § 222A(1) (1965)).

As noted, there is evidence that defendant has already received approximately $15,000 from the mineral rights. Defendant, relying on *Artman v. Ray*, 263 Or 529, 531, 501 P2d 63, *on reh'g*, 502 P2d 1376 (1972), argues that a plaintiff must be entitled to immediate possession of a chattel to successfully assert that the defendant's failure to yield possession constitutes conversion. According to defendant, plaintiffs are not entitled to immediate possession because they cannot establish that they ever had an interest in the chattel. Defendant argues that is so because the parol evidence rule bars the court from considering Hutton's intent, and even if it did not, Hutton clearly intended to give the mineral rights solely to defendant. We reject defendant's

contention because, as we explained above, the parol evidence rule does not prevent consideration of Hutton's intent, 255 Or App at 125, and whether Hutton intended to convey the mineral rights solely to defendant or for the purpose of establishing a trust for the siblings to receive equal shares of the money from those rights is a triable issue of fact, 255 Or App at 127. *See, e.g.*, *Briggs v. Lamvik*, 242 Or App 132, 142-43, 255 P3d 518 (2011) (trial court erred in granting summary judgment "given the existence of triable issues of fact pertaining to [trustor]'s intent that are material to the disposition of [the conversion] claim").

Defendant also asserts that plaintiffs failed to supply evidence that Hutton communicated his intent to defendant. We disagree. A person can convert a chattel even when the person reasonably believes that he or she is legally entitled to the property. *Briggs*, 242 Or App at 141-42. At the very least, whether defendant knew about Hutton's intent is a triable issue of fact because Everson submitted an affidavit stating that she, defendant, and Hutton had discussed that the purpose of the conveyance was "for the purpose of [defendant] taking control on our behalf, for all five of us children." 255 Or App at 119.

Finally, defendant argues that plaintiffs do not seek the type of damages provided for by a conversion claim. Damage for conversion is based on the valuation of the property a reasonable time prior to and subsequent to the conversion. *Harris v. Cantwell*, 47 Or App 211, 215, 614 P2d 124, *rev den*, 290 Or 149 (1980). For the purposes of a conversion claim, money can be chattel. *See In re Martin*, 328 Or 177, 184 n 1, 970 P2d 638 (1998) (holding that a lawyer's misappropriation of money in a client's trust account constituted conversion of chattel). Defendant asserts, without elaborating, that plaintiffs' complaint does not seek, as damages, the value of the thing that was taken. Plaintiffs, however, allege and have provided evidence that defendant converted their portion of the proceeds in the mineral rights. Defendant has collected approximately $15,000 from the mineral rights, 80 percent of which plaintiffs contend belong to them as damages for defendant's conversion. Accordingly, we conclude that the trial

court erred in granting defendant's motion for summary judgment against the conversion claim.

We turn to plaintiffs' unjust enrichment claim. As noted, plaintiffs appear to request that the court impose a constructive trust on the mineral rights to prevent unjust enrichment. *See* 255 Or App at 118. The elements of the quasi-contractual claim of unjust enrichment are (1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it. *Jaqua v. Nike, Inc.*, 125 Or App 294, 298, 865 P2d 442 (1993). It is undisputed that defendant received and knew she received the mineral rights. Thus, the only issue is whether plaintiffs adduced sufficient evidence to allow a factfinder to find that it would be unjust to allow defendant to retain all of the rights or the value of the rights. A plaintiff can show a recipient's actions are unjust by proving one of three things:

"(1) the plaintiff had a reasonable expectation of payment;

"(2) the defendant should reasonably have expected to pay; or

"(3) society's reasonable expectations of security of person and property would be defeated by non-payment."

*Jaqua*, 125 Or App at 298 (citing 1 Corbin, *Contracts* § 19A (Supp 1992)).

In this case, plaintiffs presented evidence that they had a reasonable expectation of payment and that defendant reasonably should have expected to pay. Everson testified that Hutton transferred the mineral rights to defendant so that defendant could set up a trust that would pay out the proceeds from the mineral rights to plaintiffs and defendant. Plaintiffs and defendant agreed that defendant would set up the trust because she lived next door to Hutton, making it convenient for Hutton. Because Hutton, defendant, and plaintiffs had conversations about this arrangement before the conveyance, plaintiffs had a reasonable expectation that, after defendant received the mineral rights and set up the trust, plaintiffs would receive payments from the proceeds

of the mineral rights. In addition, although defendant can argue that she had no expectation to pay because she paid $1 to Hutton as consideration for the mineral rights, she should have expected to pay plaintiffs for retaining all of the mineral rights. In accordance with plaintiffs' evidence, defendant knew that the deed was in her name temporarily so that she could set up the trust for her siblings, and after the trust was set up, she would receive only 20 percent of the proceeds from the mineral rights. In essence, she would only own 20 percent of those proceeds. Therefore, she should have expected to pay 80 percent of the proceeds from the mineral rights to plaintiffs. Viewing the facts in plaintiffs' favor, plaintiffs have presented evidence to allow the unjust enrichment claim to go to trial.

Reversed and remanded.