No. 58 October 26, 2017 115

IN THE SUPREME COURT OF THE
STATE OF OREGON

LARISA'S HOME CARE, LLC,
an Oregon limited liability company,
*Petitioner on Review,*

*v.*

Karen NICHOLS-SHIELDS,
the duly appointed Personal Representative
of the Estate of Isabell Prichard, Deceased,
*Respondent on Review.*

(CC C124865CV; CA A154950; SC S064120)

On review from the Court of Appeals.*

Argued and submitted March 3, 2017, at Willamette University College of Law, Salem, Oregon.

Ross Day, Day Law & Associates, PC, Portland, argued the cause and filed the brief for petitioner on review. Also on the brief was Matthew Swihart.

Hafez Daraee, Luby/Daraee Law Group, PC, Tigard, argued the cause and filed the brief for respondent on review.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Nakamoto, Flynn, and Duncan, Justices.**

NAKAMOTO, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

_____

\* Appeal from Washington County Circuit Court, Janelle F. Wipper, Judge. 277 Or App 811, 372 P3d 595 (2016).

\*\* Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Brewer, J., retired June 30, 2017, and did not participate in the decision of this case.

**NAKAMOTO, J.**

The issue presented is whether an adult foster care provider claiming unjust enrichment may recover the reasonable value of its services from a defendant who, through fraud, obtained a lower rate from the provider for the services. We conclude that, generally, a defendant who obtains discounted services as a result of fraud is unjustly enriched to the extent of the reasonable value of the services. We therefore reverse the contrary holding by the Court of Appeals. Because the fraud here occurred in the context of a person being certified as eligible for Medicaid benefits, however, we remand for the Court of Appeals to consider whether certain provisions of Medicaid law may specifically prohibit plaintiff from recovering in this action.

## I. BACKGROUND

The facts leading to this action revolve around the Medicaid application of decedent Isabell Prichard and the services that Prichard received at Medicaid rates from plaintiff, Larisa's Home Care, LLC, during the last months of her life. Because the trial court ultimately granted judgment for plaintiff, we set out the facts and all inferences in the light most favorable to that party. *See James v. Clackamas County*, 353 Or 431, 433-34, 299 P3d 526 (2013) (so noting and citing authorities).[1]

### A. *Background on the Medicaid Program*

For context, we begin with some background on the Medicaid program. Medicaid "is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 US 297, 308, 100 S Ct 2671, 65 L Ed 2d 784 (1980). Although the Medicaid program is partly financed by the federal government, each state administers its own program. 42 CFR § 430.0. To do so, each state creates its own "state plan." *See* 42 USC § 1396a (setting out requirements for state plans); 42 CFR § 430.10

---

[1] The Court of Appeals declined to exercise its discretion under ORS 19.415(3) to determine the facts *de novo* in this equitable action. *Larisa's Home Care, LLC v. Nichols-Shields*, 277 Or App 811, 813 n 2, 372 P3d 595 (2016).

(describing state plans). Oregon's state plan is administered by the Department of Human Services (department). *See* ORS 409.010(2)(b) (department is responsible for programs and services relating to elderly and persons with disabilities); ORS 410.070 (department's duties regarding same); ORS 411.060 (authority to adopt and enforce rules).[2]

The department requires an application to determine a person's eligibility for Medicaid benefits. *See* OAR 461-115-0700 (requiring that "all eligibility factors must be verified at initial application"). As relevant here, a person applying for Medicaid benefits must disclose any asset transfers made within the past 60 months. That disclosure permits the department to determine whether those transfers disqualify the person from receiving benefits for a period of time. If the applicant has made transfers within the 60 months preceding the application for benefits, and if those transfers were "in whole or in part for the purpose of establishing or maintaining eligibility for benefits," then the person will be disqualified from receiving benefits for a period of time. OAR 461-140-0210(2), (5). The length of the disqualification period depends on the amount transferred: the greater the amount, the more months the person will have to wait to receive benefits. *See* OAR 461-140-0296(2) (as applicable here, disqualification period in months is determined by dividing amount transferred by $5,360).

B.   *Plaintiff's Services to Prichard at Medicaid Rates*

Plaintiff owns two adult foster homes for the elderly. Plaintiff had contracted with the department to provide services in a home-like setting to patients who qualified for Medicaid. For those patients, the rates charged would be those set by the department.

Prichard, an elderly woman who suffered from cognitive difficulties and dementia, became one of plaintiff's patients in June 2007. Prichard then resided and received

---

[2] Except as otherwise noted, all references to sections of the Oregon Revised Statutes are to current versions of those statutes, which have not been modified since 2007 in any way dispositive as to the issues presented here. By contrast, and except as otherwise noted, all references to rules for Oregon's state plan are to the versions of the Oregon Administrative Rules in effect on April 17, 2007, the date that Prichard applied for Medicaid.

care in one of plaintiff's adult foster homes until her death in November 2008. Because Prichard had been approved to receive Medicaid benefits, plaintiff charged Prichard the rate for Medicaid-qualified patients: approximately $2,000 per month, with approximately $1,200 of that being paid by the department.

Plaintiff's Medicaid rates were substantially below the rates paid by plaintiff's non-Medicaid patients, or "private pay" patients. For private pay patients, the rate varied depending on the level of care. During Prichard's stay, plaintiff charged private pay patients $4,000 per month for Level 2 care, and for more intensive Level 3 care, plaintiff charged private pay patients $5,700 per month. Prichard received Level 2 and Level 3 care during her stay in plaintiff's facility. If Prichard had not been approved for Medicaid benefits and had instead been a private pay patient, she would have paid plaintiff over $48,000 more for her care.

C.  *Prichard's Medicaid Application*

Prichard's application for Medicaid benefits, as with her other affairs, was handled by her son, Richard Gardner. Prichard had given Gardner a power of attorney to act on her behalf back in 2004. Exercising his authority to apply for Medicaid benefits on behalf of Prichard, Gardner completed the application form on April 17, 2007. Gardner affirmatively represented on Prichard's application that she had not given away or transferred any cash or other property to anyone in the preceding 60 months. As a result, the department approved Prichard for Medicaid benefits.

Prichard's affairs were not as represented on the form, however. Her application form was false in its representation that there had been no transfers in the past 60 months. In actuality, Gardner had for years been transferring Prichard's assets, mostly to himself (or using those funds for his personal benefit). In the 60 months before Prichard's application for Medicaid, Gardner had transferred away over $150,000 of Prichard's assets.

Gardner's misconduct was discovered by another of Prichard's children: defendant Karen Nichols-Shields, who was appointed the personal representative for Prichard's

estate. In 2009, defendant contacted the police and reported her brother for theft.

Ultimately, Gardner pleaded guilty to three counts of criminal mistreatment in the first degree.[3] Gardner's sentence included an obligation to pay a compensatory fine to Prichard's estate in the amount of $195,710.11. Gardner has complied with that obligation and paid the estate. Thus, the amount that Gardner took from Prichard was restored to Prichard's estate.

D.   *Plaintiff's Action Against Prichard's Estate*

After defendant, in her capacity as personal representative, denied plaintiff Larisa's Home Care, LLC's claim against Prichard's estate, plaintiff filed this action.[4] In its complaint, plaintiff sought equitable relief for unjust enrichment. Essentially, plaintiff asserted that Prichard had been qualified for Medicaid through fraud and that Prichard should have been charged as a private pay patient. It sought restitution from the estate for the difference between the amount Prichard would have paid as a private pay patient and the amount that plaintiff actually received for Prichard's care at plaintiff's adult foster home.

After a bench trial, the trial court ruled in favor of plaintiff, concluding that there was unjust enrichment. The court explained:

"[A]s a whole, there is no reason why, as we look at this case as a[n] equitable one and fundamental fairness, that because of that fraud, the fraud on the applications, the

---

[3] Criminal mistreatment in the first degree is defined in ORS 163.205. One of the ways in which a person commits the crime is when, "in violation of a legal duty to provide care for a dependent person or elderly person," or having undertaken that care, the person "intentionally or knowingly":

"Hides the dependent person's or elderly person's money or property or takes the money or property for, or appropriates the money or property to, any use or purpose not in the due and lawful execution of the person's responsibility[.]"

ORS 163.205(1)(b)(D).

[4] The Court of Appeals correctly noted that an action against Prichard's estate is properly brought against its personal representative, defendant. *Larisa's Home Care, LLC v. Nichols-Shields*, 277 Or App 811, 814 n 4, 372 P3d 595 (2016); *see* ORS 115.305 ("All causes of action or suit, by one person against another, survive *** against the personal representative of the latter.").

fraud on all the paperwork that was presented, that the estate of Ms. Prichard should not now be basically paying [the] debt.

"[The estate] cannot now benefit from all that has come before to this particular point. It would be unfair for the plaintiff to be left holding the bag *** and for the estate to now benefit from the fraud."

The court also concluded that Medicaid law did not prevent plaintiff's recovery. Accordingly, the court entered judgment in favor of plaintiff for $48,477.

Defendant appealed to the Court of Appeals. She presented two arguments, broadly speaking: (1) there was no unjust enrichment; and (2) regardless, Medicaid-related law (statutes, rules, and the terms of plaintiff's contract with the department) prohibited plaintiff from recovering from defendant. Without reaching the Medicaid issues, the Court of Appeals agreed with defendant that there was no unjust enrichment. *Larisa's Home Care, LLC v. Nichols-Shields*, 277 Or App 811, 372 P3d 595 (2016).

The Court of Appeals began with its precedent concerning the elements of a "quasi-contractual claim of unjust enrichment." *Id.* at 815 (internal quotation marks and citation omitted). The elements that the Court of Appeals has long used are "'(1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it.'" *Id.* The court quoted its decision in *Cron v. Zimmer*, 255 Or App 114, 130, 296 P3d 567 (2013), which in turn had restated the elements that the court first articulated in *Jaqua v. Nike, Inc.*, 125 Or App 294, 298, 865 P2d 442 (1993).

The Court of Appeals also relied on *Jaqua* for the legal standard used in determining when it is "unjust" for the defendant to retain the benefit. *Larisa's Home Care, LLC,* 277 Or App at 816. The court explained that its precedent required plaintiff to prove at least one of the following circumstances:

"'(1) the plaintiff had a reasonable expectation of payment;
(2) the defendant should reasonably have expected to pay;

or (3) society's reasonable expectations of security of person and property would be defeated by non-payment.'"

*Id.* (quoting *Jaqua*, 125 Or App at 298). None of those three forms of unjust enrichment, the court concluded, were proved in this case.

As to the first form of unjust enrichment, the court determined that plaintiff did not have a reasonable expectation of payment. Prichard had been qualified for Medicaid, and plaintiff thus was contractually obligated to charge her only the Medicaid rate. Plaintiff's reasonable expectation was to receive the Medicaid rate payment and nothing more. *Larisa's Home Care, LLC,* 277 Or App at 816-18. As for defendant's expectation to pay, the second form, the Court of Appeals held that there was no evidence in the record that would permit a finding that Prichard reasonably should have expected to pay the private pay rate. *Id.* at 818.

Finally, as to the third form of unjust enrichment, the Court of Appeals held that societal expectations would not be defeated by the estate's nonpayment. The court based that holding on two different conclusions. First, the court derived from Medicaid law certain underlying policies that, it concluded, reflected a societal expectation that Medicaid providers would not seek to recover funds beyond what Medicaid allowed. *Id.* at 818-19 (for example, ORS 443.739(16), a "bill of rights" for residents of adult foster homes, states that a provider "may not solicit, accept or receive money or property from a resident other than the amount agreed to for services"). Second, the court concluded that the wrongdoer was Gardner, not Prichard, who was blameless, and that therefore her estate should not be required to pay for Gardner's wrongdoing. *Id.* at 819-20.

Having concluded that plaintiff had failed to adduce sufficient evidence that Prichard's estate had been unjustly enriched in any of the three ways reflected in its case law, the Court of Appeals reversed the judgment of the trial court. *Id.* at 820. Plaintiff then sought review in this court.

## II.   ANALYSIS

Before turning to our analysis, we note the scope of this opinion. When we allowed review, we did so to address

the unjust enrichment question only, not the issues of Medicaid law that the Court of Appeals did not reach due to its holding. As we will explain, we conclude that plaintiff did show that Prichard's estate has been unjustly enriched. We therefore remand for the Court of Appeals to address in the first instance whether certain provisions of Medicaid law may nevertheless prohibit recovery.

A.   *Arguments on Review*

On review and throughout the litigation, plaintiff has offered several different theories of misconduct—not just by Gardner, but by defendant as well—that it claims would justify its recovery on its claim of unjust enrichment. We find it necessary to address only one, because it is dispositive. That theory, based on fraud, can be broken down into three components: First, the false representations on Prichard's Medicaid form caused her to be wrongfully qualified for Medicaid benefits; she would have been disqualified had the misrepresentations not been made. Second, Gardner acted as Prichard's agent in making those misrepresentations, and Prichard was legally responsible to third parties for those misrepresentations, even though she had not made them herself. Third, Prichard's estate was unlawfully enriched by those false representations, and so it is subject to restitution. In sum, plaintiff argues, because of fraud, plaintiff charged Prichard a lower rate and the estate now has nearly $50,000 more money than it would have had, but for the fraud. Arguing that fraud is a recognized basis for a claim of unjust enrichment, plaintiff asserts that the Court of Appeals erred in holding that there was no unjust enrichment here.

Defendant asserts that the Court of Appeals correctly identified and analyzed the three circumstances from *Jaqua* in which a benefit or enrichment is considered "unjust." In support, she argues that Gardner's transfers would not disqualify Prichard from receiving Medicaid benefits and that Prichard was innocent of, and not liable for, Gardner's misconduct. Thus, defendant asserts, plaintiff had no reasonable expectation of payment, and defendant should not be expected to pay. Defendant further contends that societal expectations have been satisfied because

the department has never changed its determination that Prichard was eligible for Medicaid benefits; the department was reimbursed from the estate for Medicaid benefits it provided to Prichard; and the department paid plaintiff for Prichard's care at Medicaid rates.

Thus, the parties initially square off over the legal standards that govern a claim of unjust enrichment, with plaintiff asserting that fraud is sufficient to establish liability for unjust enrichment and defendant asserting that the factors listed in *Jaqua* for determining an "unjust" benefit should govern. The parties also dispute whether, under any theory of unjust enrichment, plaintiff proved its claim.

B.  *Restitution and Unjust Enrichment Generally*

Before addressing the legal standards governing plaintiff's claim of unjust enrichment, we observe that, for several reasons, restitution and unjust enrichment have been notoriously difficult to conceptualize and to summarize. That background helps to explain this court's historical case-by-case approach to restitution cases.

One difficulty is the current state of development of the law of restitution and unjust enrichment. The concept of restitution and unjust enrichment as a single area of the law was largely the creation of the American Law Institute with its publication of the first *Restatement of Restitution* in 1937. *See* Andrew Kull, *Rationalizing Restitution*, 83 Cal L Rev 1191, 1192 (1995) (attributing the "modern law of restitution" to the first *Restatement*, "in the sense that the law of contracts and the law of torts were invented by the nineteenth-century treatise writers"); Peter Birks, *Unjust Enrichment and Wrongful Enrichment*, 79 Tex L Rev 1767, 1768 (2001) (agreeing about importance of first *Restatement*).

Though the concepts of restitution and unjust enrichment long predated the first *Restatement*, they were not treated as a coherent whole. Instead, they were a collection of individualized forms of action and remedies. *See Restatement (Third) of Restitution and Unjust Enrichment*, Reporter's Introductory Memorandum, xv (Discussion Draft 2000) (prior state of law was "a miscellaneous assortment (part legal, part equitable) of forms of action and remedial

devices, familiar in some of their particularized applications but never described or understood as parts of a coherent whole"); Birks, 79 Tex L Rev at 1768 ("the fragments [of pre-*Restatement* law] had acquired a life of their own, moving ever further apart"). The drafters of the first *Restatement* themselves noted in a contemporary law review article that the law at that time was "scattered through many sections of the digests and in treatises on apparently diverse subjects." Warren A. Seavey & Austin W. Scott, *Restitution*, 54 LQ Rev 29, 29 (1938). The purpose of the first *Restatement* was to identify the underlying principles of an area of law that "has never been dealt with as a unit and because of this has never received adequate treatment." *Id.*

It is safe to say that the law of restitution remains a work in progress, with some principles recognized but with some theoretical underpinnings yet to be settled. Indeed, despite attempts by scholars to articulate basic legal principles governing restitution and unjust enrichment in the ensuing 80 years since the first *Restatement*, at least one foundational principle remains the subject of disagreement. Professor Kull has explained that, while the "modern consensus puts unjust enrichment at the heart of liability in restitution," it is unclear whether restitution includes anything else. 83 Cal L Rev at 1193-94; *see Restatement (Third) of Restitution and Unjust Enrichment* § 1 comment a (2010) ("*Restatement (3d) Restitution*") (noting disagreements among authorities). Professor Birks explains that, at "the beginning of the twenty-first century, a schism divides the scholars who write on the modem law of restitution," with some who think that "restitution and unjust enrichment are different names for the same area of law," while others maintain that a right to restitution "may be triggered by one of a number of distinct causative events," including at least "wrongs and unjust enrichment." 79 Tex L Rev at 1769-70. The current *Restatement* sums it up: "It is by no means obvious, as a theoretical matter, how 'unjust enrichment' should best be defined; whether it constitutes a rule of decision, a unifying theme, or something in between; or what role the principle would ideally play in our legal system." *Restatement (3d) Restitution* § 1 comment a, at 4. The current status of the law of restitution may be analogous to tort

and contract law in the nineteenth century, when treatise writers were first defining those areas of the law. Kull, 83 Cal L Rev at 1194-95.

Another difficulty with this area of law is the terminology itself, which can give rise to disordered thinking about the concepts. Professor Kull has noted "[t]he linguistic confusion that bedevils the law of restitution—necessitating laborious definitions before anyone can understand what you are talking about." 83 Cal L Rev at 1191-92. As a legal term, "restitution," for example, is broader than the ordinary meaning might suggest. It is not limited to those circumstances in which a defendant must give back something that had previously belonged to the plaintiff; it may also sometimes require a defendant to give to the plaintiff something the plaintiff never had. *Restatement (3d) Restitution* § 1 comment a; *see* George E. Palmer, 1 *Law of Restitution* § 1.1, 4 (1978) ("The term ['restitution'] is not wholly apt since it suggests restoration to the successful party of some benefit obtained from him.").

As a term, "unjust enrichment" also can be misleading, suggesting that liability turns on vague notions of injustice. The traditional definition is that coined by Lord Mansfield: whether a party, "upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." *Moses v. Macferlan*, 2 Burr 1005, 1012, 97 Eng Rep 676, 681 (KB 1760), quoted in *Restatement (3d) Restitution* § 1 comment b, at 4. Yet "natural justice and equity" is a standard that provides little guidance for individual decisions and has been criticized as "an open-ended and potentially unprincipled charter of liability." *Restatement (3d) Restitution* § 1 comment b, at 5. In actuality, the question of when enrichment is unjust does not turn on whether one has been unjustly enriched in some abstract sense of moral judgment; the law of restitution has developed with greater specificity based on articulated legal standards:

> "In reality, the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment. The law's potential for intervention in transactions that might be challenged as inequitable is narrower, more predictable, and more objectively

determined than the unconstrained implications of the words 'unjust enrichment.'"

*Restatement (3d) Restitution* § 1 comment b, at 5. *See also* Dan B. Dobbs, 1 *Dobbs Law of Remedies* § 4.1(1), 552 (2d ed 1993) (noting that the "substantive question" for unjust enrichment is "whether the defendant is unjustly enriched *by legal standards*" (emphasis added)); Michael Traynor, *The Restatement (Third) of Restitution & Unjust Enrichment: Some Introductory Suggestions*, 68 Wash & Lee L Rev 899, 900-01 (2011) ("The enrichment must be 'unjustified' under the law, not simply 'unjust' because you as a judge, scholar, or lawyer might think so." (Footnote omitted.)).

C.  *Approach by Oregon Courts to Unjust Enrichment Cases*

In keeping with the state of restitution and unjust enrichment as a developing area of the law, this court recognized several years ago that our case law has addressed unjust enrichment in a practical way, by matching the circumstances presented in the case to those patterns already recognized in the case law, without explaining an overarching doctrine. In *Tupper v. Roan*, 349 Or 211, 220, 243 P3d 50 (2010), the court stated:

"Although our cases refer to a substantive 'doctrine' of unjust enrichment, none provide any really comprehensive exposition of that doctrine. Instead, the cases simply describe the kinds of actions and circumstances that would constitute unjust enrichment warranting imposition of a constructive trust, and then observe that the concept extends to other similar acts and circumstances."

In *Tupper*, the plaintiff was seeking to impose a constructive trust on a named beneficiary's life insurance proceeds when the deceased was required by court order, but failed, to name the plaintiff as a beneficiary of his life insurance. *Id.* at 213. The court undertook the task of identifying the elements needed to prove an unjust enrichment claim in those and similar circumstances and did not attempt to state elements that would more widely apply. *See id.* at 223.

As *Tupper* indicates, the approach taken in this court's unjust enrichment cases can be described as incremental rule development on a case-by-case basis, based on

recognized grounds for imposing liability. *See Suitter v. Thompson et ux*, 225 Or 614, 625, 358 P2d 267 (1961) (quoting equity treatise for proposition that constructive trust would be imposed in various identified situations "or under any other similar circumstances" (internal quotation marks and citation omitted)). In that respect, the open-ended nature of unjust enrichment reflects the nature of equity itself. *See Teachers' Ret. Fund Ass'n v. Pirie*, 150 Or 435, 445, 46 P2d 105 (1935) ("[H]uman ingenuity and human affairs can not create a condition which the long arm of the court of equity can not reach if injustice or wrong would otherwise result.").

That incremental approach accords with the approach advocated by various commentators who assert that courts should determine whether any particular enrichment is unjust by examining whether the case type matches already recognized forms of unjust enrichment. *E.g.*, Palmer, 1 *Law of Restitution* § 1.7 at 41 ("the usual approach is to search for some particularized reason or ground for finding that the retention of the enrichment would be unjust"). The *Restatement (3d) Restitution* is organized for that approach. It contains a statement of four general principles, *see id.* §§ 1-4, and then 44 sections addressing the types of circumstances in which liability in restitution is recognized. Those include, for example, benefits conferred by mistake, §§ 5-12; cases involving defective consent or authority on the part of the transferor, §§ 13-19; and benefits acquired by tort or other breach of duty, §§ 40-48. The reporters for the first *Restatement of Restitution* offered an observation in their law review article that may serve to explain rule development in this area of the law: "It requires an extensive set of individual rules to spell out what is meant by 'unjust,' especially since we are met with the fact that in certain situations, due in part to historical accident, a person who has obviously benefited another is not entitled to recover." Seavey & Scott, 54 LQ Rev at 36.

As earlier noted, the Court of Appeals used, and defendant supports, a formulation of unjust enrichment first articulated in *Jaqua* to apply to any claim of unjust enrichment based on quasi-contract, *i.e.*, an "obligation implied in law" that accomplishes "substantial justice by preventing unjust enrichment," *Derenco v. Benj. Franklin Fed. Sav. and*

*Loan*, 281 Or 533, 557, 577 P2d 477, *cert den*, 439 US 1051 (1978). *See also* Arthur Linton Corbin, 1 *Corbin on Contracts* § 19, 46 (1963) (quasi-contract "is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent"). This case presents a quasi-contract theory of recovery.[5]

Although plaintiff's claim of unjust enrichment is based on quasi-contract, we conclude that the Court of Appeals should not have applied the formulation of unjust enrichment used in *Jaqua*, including its set of factors for determining when enrichment is unjust. As we will explain, the formula in *Jaqua* is unhelpful as an all-purpose statement of the elements of a claim of unjust enrichment, and it is also ill-suited to the circumstances of this case.

Under *Jaqua*, an unjust enrichment claim based on quasi-contract requires a showing of three elements: "a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." 125 Or App at 298. Those elements derived from the 1992 supplement to 3 *Corbin on Contracts* § 561 (1963). *See Jaqua*, 125 Or App at 298 (so noting). We note that the description of the elements of an unjust enrichment claim were not in section 561 of the original bound volume of *Corbin on Contracts*, nor were they incorporated into the 2002 interim edition or the 2010 revised edition. However, another contract law treatise recites a similar trio of elements based on holdings from a variety of courts:

> "Three elements must be established in order that a plaintiff may succeed in a claim based on unjust enrichment. These elements are:
>
> "(1) a benefit conferred on the defendant by the plaintiff;

---

[5] A quasi-contract or obligation implied in law is distinct from an implied-in-fact contract. In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. *Restatement (Second) of Contracts* § 4 comment a (1979). This court has explained that a contract implied in fact can arise "where the natural and just interpretation of the acts of the parties warrants such conclusion." *Owen v. Bradley*, 231 Or 94, 103, 371 P2d 966 (1962). Plaintiff does not contend that, by virtue of conduct, Prichard through her agent agreed to pay for services at the private-pay rate and so must be held to her bargain.

"(2)   an appreciation or knowledge by the defendant of the benefit; and

"(3)   the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."

Richard A. Lord, 26 *Williston on Contracts* § 68:5, 62 (4th ed 2003) (footnote omitted).

The formula noted in *Jaqua* and in *Williston on Contracts* was roundly criticized in the *Restatement (3d) Restitution*. "Formulas of this kind are not helpful, and they can lead to serious errors. They lend a specious precision to an analysis that may be simple or complicated but which at any rate is not susceptible of this form of statement." *Id.* § 1 comment d, at 8. As a former president of the American Law Institute noted, "The Reporter wisely advises you to avoid the temptation of formulaic checklists, which if you are not careful, could turn into formulaic jury instructions that advance neither comprehension nor clarity." Traynor, 68 Wash & Lee L Rev at 901-02 (footnote omitted).[6]

The *Restatement (3d) Restitution* specifically takes issue with both the second and third elements in the formula. It provides the following critique of the second element—the recipient's awareness of the benefit:

"If the requirement is taken to mean that a defendant cannot be liable in restitution for benefits of which the defendant was unaware—or for benefits that the defendant attempted to refuse—it is plainly incorrect. If it refers to defensive limitations on a liability based on unjust enrichment, it is both redundant (in light of the third element) and an awkward summary of several features of the law of restitution that protect the defendant's economic liberty."

*Restatement (3d) Restitution* § 1 comment d, at 8. We agree that an element that requires awareness by the recipient

---

[6] For essentially that reason, the Court of Appeals itself recently questioned the three *Jaqua* elements of an unjust enrichment claim. *See Cumming v. Nipping*, 285 Or App 233, 238-39, 395 P3d 298 (2017) (noting criticism by *Restatement (3d) Restitution*).

that a benefit has been received does not accurately apply to all unjust enrichment claims. An unjust enrichment claim based on mistake, for example, can allow imposition of liability by operation of law, regardless of such awareness. *See McKay v. Horseshoe Lake Hop Harv.*, 260 Or 612, 613-14, 491 P2d 1180 (1971) (in plaintiffs' action to recover possession of land, allowing defendant to recover in unjust enrichment for improvements it had made to plaintiffs' real property, even though both plaintiffs and defendant had mistakenly believed that defendant occupied land under 99-year lease); *Stirewalt v. Chilcott*, 236 Or 128, 134, 387 P2d 351 (1963) (finding unjust enrichment and imposing constructive trust when deed mistakenly conveyed more land to defendant buyers than buyers and sellers had intended; court rejected assertion that question was whether defendant buyers had known of sellers' mistake).

According to the *Restatement (3d) Restitution*, the third element is overbroad because it "incorporates the whole of the question presented, making the rest of the formula superfluous." *Restatement (3d) Restitution* § 1 comment d, at 8. That criticism of the third element, standing alone, is valid. However, the Court of Appeals has historically added three factors, any one of which permits the determination that enrichment is unjust:

> "'(1)   the plaintiff had a reasonable expectation of payment;
>
> "'(2)   the defendant should reasonably have expected to pay; or
>
> "'(3)   society's reasonable expectations of security of person and property would be defeated by non-payment.'"

*Jaqua*, 125 Or App at 298 (quoting 1 Corbin, *Contracts* § 19A (Supp 1992)).

The discussion above explains why those factors are substantively incorrect. The factors added by the *Jaqua* court would substitute entirely for any reference to established categories of unjust enrichment, and they are under-inclusive of all the circumstances in which a plaintiff may establish an unjust enrichment. Moreover, the unadorned factors are vague, as this action illustrates.

In part, the parties argued over the application of the first and third *Jaqua* factors. By its terms, the third factor based on societal expectations is subject to wide-ranging interpretations. Plaintiff's arguments concerning that factor focus on the ill effects of requiring it to bear the cost of what amounts to Medicaid fraud: it would encourage further fraud, an issue of vital importance to healthcare and long-term care facilities as well as patients and Oregon taxpayers. But the Court of Appeals looked at provisions of Medicaid law to conclude that they reflected societal expectations that apply generally, regardless of fraud: a care facility cannot exploit residents by extracting payments beyond Medicaid rates when the residents are deemed Medicaid-eligible. The court concluded that allowing recovery in this action would defeat those expectations. *Larisa's Home Care, LLC,* 277 Or App at 818-19.

Even the first factor—whether plaintiff had a reasonable expectation of payment—leads to very different interpretations in its application. The Court of Appeals concluded that, for plaintiff to have a reasonable expectation of receiving the private-pay rate of payment under the first factor, plaintiff had to prove that the state had determined that Prichard was not Medicaid-eligible. *Id.* at 817. Otherwise, the court concluded, plaintiff could only reasonably expect to be paid in accordance with the terms of its contract with the state. *Id.* Thus, the Court of Appeals viewed the first factor as applying regardless of the fraud and plaintiff's lack of knowledge concerning that state of affairs when plaintiff accepted Prichard as a Medicaid resident pursuant to its contract with the state. Plaintiff, on other hand, argues that, under the proper view of that factor, plaintiff can reasonably expect its residents to pay at the rate that they are properly—not fraudulently—qualified to pay.

Accordingly, we conclude that the formula for unjust enrichment in *Jaqua* is inadequate to the task, and we reject it. In lieu of applying the formula in *Jaqua*, Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust.

D.  *Legal Standards Applicable in this Case*

As we noted at the outset, at least one of plaintiff's allegations in this action falls squarely within the categories recognized by Oregon case law and treatises to involve unjust enrichment: plaintiff alleges that Prichard's estate has been benefited by fraud. "A conclusion that one party has obtained benefits from another by fraud is \* \* \* one of the most recognizable sources of unjust enrichment." *Restatement (3d) Restitution* § 13 comment a, at 166.

Specifically, plaintiff alleges that the particular fraud here involved false representations on Prichard's Medicaid form that led to Prichard being charged only Medicaid rates. The *Restatement* states the general rule regarding transfers induced by fraud as follows:

> "A transfer induced by fraud or material misrepresentation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment."

*Id*. § 13(1).

The comments to section 13 include an illustration analogous to the facts at issue here—a person who obtained services by falsely claiming to be indigent:

> "County appoints public defender to represent Defendant charged with burglary, relying on Defendant's affidavit of indigence. It transpires that Defendant owns substantial property. County is entitled to recover from Defendant the reasonable value of the services provided."

*Restatement* § 13 comment c, illustration 4, at 168.

Case law accords with that conclusion. This court itself addressed a case very similar to this one, where a person had obtained benefits by falsely claiming impoverishment, and the provider of the benefits subsequently sought to recover from the person's estate under a theory of unjust enrichment.

In *In re Anderson's Estate*, 157 Or 365, 71 P2d 1013 (1937), a former employee of a bank, Joseph Anderson, had asked his former employer for money. Anderson told the

bank that he was destitute, but his representations were false; he actually had substantial savings. *Id.* at 369-70. The bank, not knowing of Anderson's deceit, gratuitously paid Anderson $25 per month until his death, for a total of $2,500. *Id.* at 368-69.

Anderson's fraud was discovered after he died, and the bank sought to recover the amounts it had paid from Anderson's estate. This court agreed that the estate had been unjustly enriched:

> "It is plain and uncontroverted that Joseph Anderson obtained the payment of the sum of $2,500 upon different dates by means of false representations and deceit and that the bank paid the money in ignorance of the facts, of which they had no means of ascertaining the truth. Under such circumstances the bank is entitled to recover the money paid, with interest[.] Likewise where a donor has been induced through misrepresentation, fraud and deceit, exercised by the donee to make a gift, the donor may recover on the principle that no one shall be allowed to obtain any benefit arising from his own fraud or wrongful act[.]"

*Id.* at 374-75 (citations omitted).

Other jurisdictions have held similarly. In *Old Men's Home, Inc. v. Lee's Estate*, 191 Miss 669, 4 So 2d 235 (1941), a charitable home had taken care of Lee based on Lee's false representations that he was destitute, when unknown to the home, Lee had some $5,000 in the bank. The Supreme Court of Mississippi upheld the home's claim against Lee's estate for the value of its services. 191 Miss at 681, 4 So 2d at 236. *See also Jones v. Stearns*, 97 Vt 37, 122 A 116 (1923) (allowing couple to recover value of support they had rendered to decedent, based on decedent's false representation that she was destitute); *Eggers v. Anderson*, 63 NJ Eq 264, 272-73, 49 A 578, 582 (NJ 1901) (allegations would support equitable relief requiring executor "to pay out of the estate such sum as will recompense [a charitable group] for the money and property which they were induced to furnish to and for Mrs. Stager because of her fraudulent pretense of poverty").

In short, both the *Restatement (3d) Restitution* and our case law are in accord that a person—and his or her

estate—have been unjustly enriched if the person obtains benefits by making false representations about his or her financial state. Accordingly, we turn to whether the particular facts of this case fall within that category of unjust enrichment.

E. *Application*

Defendant contends that plaintiff's case fails at two points. First, she essentially challenges causation: She asserts that the false representations on Prichard's Medicaid application would not have disqualified her from Medicaid. If Prichard would have qualified for Medicaid benefits without regard to whether the form disclosed the numerous transfers of her assets, then there could be no enrichment at all. Plaintiff would have been required to charge Prichard only the Medicaid rate. Second, defendant argues that the false representations were by Gardner, not Prichard, and Prichard should not be held responsible for those misrepresentations.

Before we turn to the specifics of defendant's causation argument, we provide a brief overview of the relevant disqualification law. As noted, the Medicaid application filled out by Gardner required the disclosure of all transfers made within the previous 60 months. Generally, transfers are disqualifying if they are "made in whole or in part for the purpose of establishing or maintaining eligibility for benefits." OAR 461-140-0210(2). Many transfers are not disqualifying, however; a second rule, OAR 461-140-0220, identifies those nondisqualifying transfers. For example, a transfer is not disqualifying if the asset is "sold or traded" "for compensation equal to or greater than fair market value." OAR 461-140-0220(2)(a).

Defendant does not dispute that the undisclosed transfers here were generally disqualifying as transfers made in whole or in part to establish eligibility for benefits.[7] Both sides also either agree or assume that—if the undisclosed transfers were disqualifying—then the disqualification period

---

[7] In particular, the evidence shows that substantial sums were transferred to defendant and the other children at defendant's suggestion and explicitly for the purpose of establishing Prichard's eligibility for Medicaid benefits.

would have extended through the remainder of Prichard's life and covered the entirety of her stay at plaintiff's facility.

Defendant instead asserts that the undisclosed transfers here were not disqualifying, because they fell under an exception to the general rule. Under OAR 461-140-0220(7), a transfer is not disqualifying if the "client was a victim of fraud * * *, and legal steps have been taken to recover the asset." Prichard was the victim of Gardner's fraud in making the transfers, and legal steps have now been taken—successfully—to recover those transfers. Thus, defendant maintains, Prichard would not have been disqualified from receiving Medicaid, so Prichard correctly paid only Medicaid rates while at plaintiff's facility.

Defendant's argument fails to recognize, however, that the disqualification rules are written to address the situation at a specific point in time: they are forward looking. They presume that an applicant has just applied for Medicaid, and they set out the method that the department will use to determine how far into the future an applicant will be disqualified from benefits (if at all). Thus, OAR 461-140-0296(2) explains how to calculate the length of the disqualification period, starting with the "initial month"—the month that the applicant is "first * * * eligible for a program benefit," OAR 461-001-0000(31).

The time-dependent nature of the rules is even more clearly illustrated in OAR 461-140-0300(2), which provides that "the disqualification ends if the transfer that caused the disqualification is rescinded." The fact that rescission merely causes the disqualification to "end" at that time does not match defendant's position, which would imply that rescission would retroactively qualify the applicant for benefits for months that have already passed.

When we examine the facts as they existed on April 17, 2007—the date Prichard applied for Medicaid—we see that no steps had been taken to recover any of Gardner's wrongful transfers. Thus, the requirements of OAR 461-140-0220(7) had not been met. If the transfers had been disclosed on the form, then Prichard would have been disqualified from receiving Medicaid benefits while she stayed at plaintiff's facility. The false representations on the Medicaid

form thus enabled Prichard to pay the discounted Medicaid rates, when she otherwise would have had to pay the higher private-pay rates.

We turn, then, to defendant's second argument: Was Prichard legally responsible for Gardner's false representations? Defendant asserts that she was not. Under standard agency principles, however, we conclude that Gardner acted as Prichard's agent when he filled out the Medicaid application for her. As to third parties, Prichard was legally responsible for Gardner's false representations.

Defendant's argument turns on Prichard's incapacity. Defendant admits that Prichard, through her power of attorney, had given Gardner authority to act as her agent. Defendant notes, however, that Prichard had become incompetent by the time Gardner filled out the Medicaid application form. Defendant maintains that Prichard's incompetency had terminated Gardner's agency.

We disagree. Prichard's power of attorney expressly stated that Gardner's authority to act would apply "regardless of my subsequent disability or incompetence." Such a provision is lawful and valid. When Gardner filled out Prichard's Medicaid application, ORS 127.005(1)(c) (2005) provided that, unless the principal's written designation stated otherwise, the "powers of the attorney-in-fact or agent shall be exercisable by the attorney in-fact or agent on behalf of the principal notwithstanding the later disability or incompetence of the principal at law." *See also Restatement (Third) of Agency* § 3.08(2) (2005) ("*Restatement (3d) Agency*") ("A written instrument may make an agent's actual authority effective upon a principal's loss of capacity, or confer it irrevocably regardless of such loss."). Defendant cites no authority to the contrary. Thus, Prichard's incompetence did not end Gardner's agency.

Gardner filled out the Medicaid form as Prichard's agent. In doing so, Gardner made a misrepresentation on Prichard's behalf and for the purpose of getting her Medicaid benefits. He represented on the form that Prichard had made no transfers, knowing that that representation was false. Because Gardner made a false representation while

acting as Prichard's agent and on her behalf, Prichard is liable for the fraud.

> "A principal is liable to third persons for frauds, deceits, concealments, torts and omissions of duty of his agent, when acting in the course of his employment, although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them."

*White v. Gordon et al.*, 130 Or 139, 143, 279 P 289 (1929) (internal quotation marks and citation omitted)). *See Barnes v. Eastern & Western Lbr. Co.*, 205 Or 553, 588, 287 P2d 929 (1955) ("[A] principal, who commits to an agent a duty, in the performance of which the agent will be required to make representations, is liable for misrepresentations made by [the agent] in the discharge of the duty which he employed in his efforts to serve his principal."); ORS 127.005(2) (2005) ("All acts done by the attorney-in-fact or agent under the power of attorney during any period of disability or incompetence of the principal at law shall have the same effect and shall inure to the benefit of and bind the principal as though the principal were not disabled or incompetent."); *Restatement (3d) Agency* § 7.08 ("A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort[.]").

The Court of Appeals noted that Prichard was Gardner's victim. That statement is certainly true, insofar as Gardner misappropriated Prichard's assets. Gardner was convicted of committing a crime against Prichard, and we do not question that Prichard's estate could have obtained a verdict in an appropriate civil action against Gardner. But an agent's actions may make a principal liable to a third party, even if the agent's actions are themselves a breach of the agent's duty to the principal. *See Restatement (3d) Agency* § 2.01 comment f, at 85 (noting that agent's actions may make principal liable to third party, even though agent is liable to principal for having breached duty). The issue concerns third-party liability—whether Prichard is liable to

plaintiff as principal for the misrepresentation of her agent, not whether Gardner is liable to Prichard for breaching his duties to her as principal. From the perspective of third parties such as plaintiff, Prichard is liable for false representations by her agent, Gardner.[8]

The facts in this case thus support a determination of unjust enrichment. Prichard (through Gardner) made false representations specifically for the purpose of obtaining Medicaid benefits. Plaintiff provided valuable care to Prichard at a substantially discounted rate, precisely because of those false representations. Prichard's estate is substantially larger because Prichard did not have to pay plaintiff the private-pay rates. It would be unjust and inequitable for Prichard's beneficiaries to retain the benefits that Prichard had gained through the misrepresentation. We conclude that the Court of Appeals erred in holding that there was no unjust enrichment. Accordingly, we reverse that determination.

---

[8] The *Restatement (3d) Restitution* suggests that Prichard's estate might be subject to restitution even if Gardner was not her agent and Gardner's fraud was not attributable to her:

"A transfer induced by fraud or material misrepresentation is subject to restitution, whether the representation is made by the transferee *or by a third party.*"

*Id*. § 13 comment g, at 171 (emphasis added). The *Restatement* then offers the following example:

"13. Corporation pays $45 million in bonuses to its President, based on its reported net income during a five-year period. It is subsequently revealed that Corporation's net income for the period was artificially inflated, in consequence of an accounting fraud perpetrated by certain officers and directors. (Corporation was actually operating at a loss.) Corporation has a claim in restitution against President to recover $45 million plus interest. *Restitution from President does not depend on proof that President participated in the fraud, or that President had notice that earnings were overstated.*"

*Id*. § 13 comment g, illustration 13, at 172 (emphasis added). *See also Tupper*, 349 Or at 224 (noting in constructive trust context that prior decisions by this court suggest that unjust enrichment may be found even when recipient is innocent).

The *Restatement* does indicate that the innocence of the recipient can affect the results of the case. An innocent recipient may be entirely protected against restitution by affirmative defenses. *See id*. § 13 comment g, at 171. The recipient's innocence may also limit the amount of restitution. *See id*. § 50 (setting out principles for determining amount of restitution where recipient was innocent). In this case, however, we need not decide whether an innocent recipient would be subject to restitution, because Prichard was liable as principal for the misrepresentations of her agent, Gardner.

### III.   MEDICAID-SPECIFIC ARGUMENTS

Subject to defendant's arguments specific to the Medicaid context, plaintiff is entitled to restitution. We address one of those arguments and remand the case to the Court of Appeals for its determination as to the second of those arguments.

Before the Court of Appeals, defendant first asserted that plaintiff's action is an improper collateral attack on the department's exclusive right under ORS 410.070(1) to make Medicaid eligibility decisions.[9] Based solely on the citation to ORS 410.070, she contends on review that the department's original decision to qualify Prichard for Medicaid is legally binding on plaintiff in this action, unless and until the department itself overturns it or plaintiff successfully challenges it in an unspecified administrative proceeding brought against the department.

In essence, defendant contends that, in light of the department's charge to administer Medicaid in Oregon, plaintiff cannot invoke the assistance of an Oregon court of equity. We reject that contention and agree with plaintiff's arguments in the Court of Appeals. First, ORS 410.070 does not contain a provision barring equitable actions by Medicaid service providers. Furthermore, given

---

[9] In part, ORS 410.070(1) provides:

"(1) The Department of Human Services shall:

"(a) Serve as the central state agency with primary responsibility for the planning, coordination, development and evaluation of policy, programs and services for elderly persons and persons with disabilities in Oregon.

"*****

"(e) Receive and disburse all federal and state funds allocated to the department and *** enter into contracts with private entities for the purpose of providing or contracting for case management services for long term care insurance for the benefit of elderly persons and persons with disabilities in this state.

"*****

"(k) Conduct regulatory functions with regard to program operation, by adopting rules for providing social services, including protective services, to elderly persons and persons with disabilities who need services that the department or area agencies are authorized to provide and rules for standard rate setting and quality assurance."

ORS 411.630,[10] which establishes that it is unlawful for recipients of public assistance to use fraud to obtain benefits, there is no reason to infer from ORS 410.070 that, when a recipient commits fraud against a Medicaid service provider, the provider is barred from recovering from the fraud feasor in equity.

Defendant's second Medicaid-specific argument in the Court of Appeals was that plaintiff is barred from recovering because of plaintiff's contract with the department and Medicaid law concerning acceptance of payment for services. Specifically, defendant cited ORS 443.739(16) (adult foster care resident has a right to be "free from financial exploitation" and provider "may not solicit, accept or receive money or property from a resident other than the amount agreed to for services") and OAR 411-050-0435(1)(d) ("The rate of compensation established by the [department] is considered

---

[10] ORS 411.630 provides:

"(1) A person may not knowingly obtain or attempt to obtain, for the benefit of the person or of another person, any public assistance or medical assistance to which the person or other person is not entitled under state law by means of:

"(a) Any false representation or fraudulent device, or

"(b) Failure to immediately notify the Department of Human Services or the Oregon Health Authority, if required, of the receipt or possession of property or income, or of any other change of circumstances, which directly affects the eligibility for, or the amount of, the assistance.

"(2) A person may not transfer, conceal or dispose of any money or property with the intent:

"(a) To enable the person to meet or appear to meet any requirement of eligibility prescribed by state law or by rule of the department or the authority for any type of public assistance or medical assistance; or

"(b) Except as to a conveyance by the person to create a tenancy by the entirety, to hinder or prevent the department or the authority from recovering any part of any claim it may have against the person or the estate of the person.

"(3) A person may not knowingly aid or abet any person to violate any provision of this section.

"(4) A person may not receive, possess or conceal any money or property of an applicant for or recipient of any type of public assistance or medical assistance with the intent to enable the applicant or recipient to meet or appear to meet any requirement of eligibility referred to in subsection (2)(a) of this section or, except as to a conveyance by the applicant or recipient to create a tenancy by the entirety, with the intent to hinder or prevent the department or the authority from recovering any part of any claim it may have against the applicant or recipient or the estate of the applicant or recipient."

payment in full and licensees must not accept additional funds or in-kind payment[.]"). Defendant also noted that the contract between plaintiff and the department provided that plaintiff agreed to accept the "rate authorized by [the department] plus the established room and board payment as payment in full, and will not charge the client any additional amounts for these services." Defendant contended that plaintiff both agreed to and was required to accept payment at the Medicaid rates as "payment in full."

The Court of Appeals did not reach that contention in its opinion. Although defendant briefly reasserts her argument in this court, she does not flesh out why her reading of the statute and the rule is correct in the context of a recipient's fraudulent receipt of the Medicaid rate, and plaintiff did not address it in its briefing in this court. That Medicaid-specific issue may well involve consideration of federal law, and it has not been briefed on elementary matters of statutory and rule construction. Under those circumstances, we decline to decide the issue as a matter of initial impression. We remand to the Court of Appeals so that it may consider that Medicaid-specific argument in the first instance.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.